## MERGENTHALER *v.* SCUDDER.

## SAME *v.* SAME.

PATENTS; INTERFERENCES; PRIORITY OF INVENTION; CONCEPTION, PROOF OF; DRAWINGS.

1. A complete conception as defined in an issue of priority of invention is matter of fact and must be clearly established by proof. The conception of the invention consists in the complete performance of the mental part of the inventive act. All that

remains to be accomplished in order to perfect the act or instrument belongs to the department of construction, not invention. It is therefore the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice that constitutes an available conception within the meaning of the patent law.

2. The date of the conception is the date when the idea of means, including all the essential attributes of the invention, becomes so clearly defined in the mind of the inventor as to be capable of exterior expression, and it is settled both by practice and express decision that such exterior expression of the mind of the inventor when relating to machinery may be by exhibits either in the form of drawings or by model, so as to lay the foundation of a claim to priority, if thereby the invention be made sufficiently plain to enable those skilled in the art to understand it.

3. The fact of conception by an inventor, for the purpose of establishing priority, can not be proved by his mere allegation nor by his unsupported testimony where there has been no disclosure to others or embodiment of the invention in some clearly perceptible form, such as drawings or model, with sufficient proof of identity in point of time.

4. Any full and accurate description of the invention, either in words or drawings or by model, if it be of a machine, or even an unsuccessful effort to embody the conception, when the effort discloses that the idea was complete, will suffice, although the attempt to represent it may have failed. In the absence of all other proof the date of the application for a patent, if containing a complete description, is taken as the date of the conception.

5. If drawings be exhibited and relied on as evidence of the conception of the invention, they must show a complete conception, free from ambiguity or doubt, and such as would enable the inventor or others skilled in the art to reduce the conception to practice without any further exercise of inventive skill.

6. Where drawings are in many essential particulars defective and wanting in completeness as means of showing and illustrating an invention involved in interference, such defects and want of completeness in the drawings can not be aided and the defective drawings made effective by construction or by reference to the prior state of the art.

7. Where an inventor has undertaken to invent and construct a machine essentially different from preexisting machines and not simply a mere improvement upon previous inventions, it is necessary for him to furnish such full, clear, and definite

drawings of his invention to prove conception as will enable any person skilled in the art of construction of such machines to reduce the invention to practical form.

Nos. 59 and 60.   Patent Appeals.   Submitted January 20, 1897.   Decided October 4, 1897.

HEARING on appeals from decisions of the Commissioner of Patents in interference proceedings.   *Reversed.*

The COURT in its opinion stated the case as follows:

These appeals are from decisions of the Commissioner of Patents, and they present questions of interference, adjudged to exist between applications for patents for line-casting machines; two of the applications having been filed by Ottmar Mergenthaler, the senior party, and one by Wilbur S. Scudder, the junior party, as the alleged inventors.   The interferences, while separately declared, are closely related to each other, and have, in all stages of the proceeding, been treated as one case.   We shall so treat them on these appeals.

These interference cases are numbered, respectively, 16,233 and 16,270 ; and the two separate applications by Mergenthaler stand numbered 375,632, and 391,702, the first of which was filed December 23, 1890, and the second May 5, 1891 ; and the one application by Scudder was filed September 14, 1892, and is No. 445,900.

The issues, as framed by the Patent Office, on the first of the applications of Mergenthaler, as senior party, with the subsequent application of Scudder, are in two counts, and are as follows:

" 1. The combination in a line-casting machine having suitable operating mechanism, of a series of matrices constructed to be assembled side by side in different orders to form the impression line, each matrix having several different characters less in number than the assortment used in the machine, the characters being independently usable.

" 2. In a line-casting machine, the combination of a series

of matrices each bearing several distinct characters, and mechanism for selecting and conducting the matrices to a place of assemblage or alignment, and adjusting the matrices endwise individually in order to bring their selected characters, one on each matrix, into a common line."

And the issues framed on the second of the applications of Mergenthaler, with the subsequent application of Scudder, are in three counts, and are as follows :

" 1. The combination in a line-casting machine having suitable operating mechanism, of a series of matrices, each having several different characters less in number than the assortment used in the machine, the characters being independently usable, and a distributing mechanism by which the matrices are returned to their place of storage through a path different from that pursued in the course of composition.

" 2. In combination with the matrices each having a series of characters at different points in its length, and a composing mechanism for assembling said matrices with their selected characters in line, a bed or support for the line having a rib or guide to engage the matrices and prevent them from shifting endwise in relation to each other after they are assembled, and means for shifting said composed line along said rib or guide to the required point.

"3. The combination with a series of matrix bars each having type on its edge, of a magazine having a chamber for and adapted to contain a plurality of each species of the series, means for separately delivering either species of matrix bar, a series of stops corresponding with the character on the matrices, and finger-keys, and connected mechanism whereby any desired stop can be projected into the path of any one of the released matrix bars."

On neither issue did Mergenthaler introduce any testimony to prove priority of invention, but rested on the dates of filing his applications, namely, December 23, 1890, and

May 5, 1891. But Scudder introduced evidence to support the claim made in his preliminary application, and, upon the evidence introduced by him, he contends that he has successfully shown conception and disclosure to others of the subject matters of the several issues of interference as far back as February, 1889, and that he made drawings of his alleged invention, in February and November, 1889; and thus he claims to have established priority of invention.

In No. 16,233, the first case of interference, the examiner of interferences decided both issues in favor of Scudder; and in No. 16,270, the second case, he decided the first issue in favor of Mergenthaler, and the second and third issues in favor of Scudder; and he accordingly awarded judgment of priority of invention in favor of Mergenthaler on the first count in No. 16,270, and in favor of Scudder on all the other issues in both cases of interference.

On appeal to the board of examiners-in-chief, that tribunal decided all the issues of interference, in both cases, in favor of Mergenthaler, thereby reversing the judgment of the examiner of interferences, so far as the latter had decided in favor of Scudder, and held that Mergenthaler was entitled to priority of invention upon all the issues of interference in both cases. That ruling was appealed from, and the cases were taken before the Commissioner of Patents in person, and the latter reversed *in toto* the decision of the examiners-in-chief, and awarded priority in favor of Scudder upon all the issues; and it is from that decision that these appeals are taken to this court.

*Messrs. Betts, Hyde & Betts (Mr. Frederick H. Betts, Mr. J. E. H. Hyde* and *Mr. Wm. B. Whitney,* of counsel,) for the appellant.

*Mr. Marcellus Bailey* for the appellee.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

The appellant has assigned several grounds or reasons for

the appeals, but they all may be reduced to two principal questions: 1st. Whether, prior to the applications filed by Mergenthaler, there was complete conception of the inventions in issue by Scudder, and sufficiently shown in proof; and, if so, 2d. Whether Scudder has proven that he proceeded with reasonable diligence to reduce the conception to practical form?

1. The appellant, Ottmar Mergenthaler, is the senior party in both interferences; and his application involved in No. 16,233 was filed nearly two years, and his application involved in No. 16,270 was filed nearly a year and a half before the single application of Scudder was filed. The cases being thus presented, the *onus* is upon Scudder to establish by clear proof the fact of priority of invention. This is an established principle both by rule and decision.

By Rule 116 of the Patent Office it is provided that, "In original proceedings in cases of interference, the several parties will be presumed to have made the invention in the chronological order in which *they claim the same in their completed applications* for patents *clearly illustrating and describing the invention;* and the burden of proof will rest upon the party *who shall seek to establish a different state of facts."* But by Rule 117 it is declared that "The preliminary statement can in no case be used as evidence in behalf of the party making it."

The allowed applications of Mergenthaler operated as constructive reduction to practice of the inventions claimed, and it was therefore incumbent upon Scudder to show by clear proof completed invention prior to the dates of such applications of Mergenthaler. *Porter* v. *Louden,* 7 App. D. C. 64, 72; *Soley* v. *Hebbard,* 5 App. D. C. 99, 103; *Christie* v. *Seybold,* 64 O. G. 1650, 1653.

Before examining the facts relating to the question of priority of invention, it may be well and of interest to refer to the state of the art of invention and construction of linotype and linecasting machines, in order to see to what extent the

previously existing invention, pertaining to the subjects involved in the present issues, may throw light upon and aid the claim and contention of either of the parties to the present cases of interference.

In a recent number of Chambers' Journal, published in Edinburgh, occurs an article giving quite a graphic description of the linotype printing machine, and which article was republished in this country, in the Eclectic Magazine of Foreign Literature, Science and Art, for July, 1897. That article is descriptive of the state of the invention prior to the dates involved in the present issues. In that article is given the history of the progress of the inventions relating to the art of printing by machine presses. The writer gives a short history of the evolution of the art, and says that it has progressed to such an extent that we now have "an almost human machine that simply needs to be kept fed with molten metal while turning out automatically the most perfect type ready for the printer's hand." After describing previous inventions and processes, the writer says :

"The invention of the linotype company machine marks a revolution greater than anything which has occurred in printing during the past four hundred years. It is neither the first nor the only attempt that has been made at what is called 'mechanical composition,' as distinguished from ordinary type-setting by hand. But it is the first successful attempt, we believe, to combine type founding with type-setting, and in point of fact to dispense with fonts of type altogether. And it is a proved success, both mechanically and economically. Even the trade unionists have recognized that the thing has 'come to stay,' and, adapting themselves to the situation, skilled compositors are as quickly as possible transforming themselves into skilful machine operators.

"The linotype can not be said to be the invention of any single individual. In its modern form it is a completion of the design of Ottmar Mergenthaler, but the machine in

use to-day represents the product of no fewer than fourteen hundred separate patents. That is to say, it is the embodiment of successive improvements, found to be necessary after Mergenthaler's machine came into practical operation. But the idea itself is an old one—as old, one may say, as the stereotyped blocks with which the ancients stamped their pottery. It is a curious thought that on the eve of the twentieth century we are going back to the first, or even earlier, in principle. But without going so far back, we may find the germ of the linotype in the logotype which early in the present century found so much favor.

.     .     .     .     .     .     .

" The difference between the linotype and all previous typesetting machines is material, for the linotype does not set type at all. It does not compose types, but composes matrices in lines. In ordinary type the characters are in relief on the metal; in a matrix the characters are impressed in *intaglio*. This was the original thing about Mergenthaler's invention—the dispensing with a magazine, or font, of movable metal types. He had many imitators, but the Court of Appeals in the United States found that he was really the first to 'combine with mechanism for forming a matrix composed of a series of dies adapted for transposition or rearrangement, a mold and a casting mechanism, and the first to produce a practical machine by which ordinary hand composition is superseded.'

"The linotype does not cast letters, it casts lines; hence its name, line-of-type. It has taken twenty years and fourteen hundred patents to bring the machine up to its present state, which may not yet be perfection, but yet it is so efficient that it is being adopted in all the principal newspaper offices in the country, and gradually in the great printing houses. It was unfortunate, perhaps, in being placed on the market too soon, for the first machines were not a success, and caused rather a prejudice against the name—a prejudice which has had to be overcome.

"The mechanical compositor has no heavy cases of type to pick and choose from. He sits in front of a machine so compact that it does not occupy more than six square feet of floor space. Before him is a key board, not unlike that of a typewriter. When he depresses a key he instantaneously releases a matrix in the magazine above him, bearing a character corresponding to the key. This magazine is placed sloping downward toward the operator, and the matrices as released drop by natural gravity through vertical channels on to a traveling belt, which carries them as quick as thought, one after the other, into a little compartment on the operator's left, where they compose the words under his eye. The side of this little chamber is open, and on the portion of the matrices exposed to view the characters they represent are marked. In this way the operator can at once detect any literal error as it occurs, extract the wrong matrix and insert the correct one in an instant without stopping the machine. When the little chamber or block, which is adjusted to the width of the column to be printed, is about full it announces the fact by ringing a bell, thus giving the operator time to see how much more he can get in. Then by the touch of a lever the operator sends the line on a stage to the moulding wheel, connected with which is a pot of molten metal, kept hot by gas burners. Half a turn of this wheel forces out a charge of molten metal and presses it into the incised letters on the matrices. The line is thus cast in an instant in a single solid bar. An arm now comes down with a swoop from the top of the machine, seizes the matrices and places them on a distributing bar, perhaps the most wonderful part of the machine, and almost human in its intelligence. Each matrix is a thin piece of brass, and on the opposite end to the letter is toothed something like a Chubb's lock, and by means of these teeth it hangs on to corresponding teeth on the bar, along which the matrices are forced by a worm wheel. At intervals there are vacancies on the bar, and a matrix on reaching one of these vacancies loses its grip there

and drops into its own proper groove, and runs into the magazine ready for use again. No matrix can drop off the bar until it reaches its own box, nor can it be carried beyond, for the slightest disturbance of the adjusted teeth causes the machine to stop.

"Now to come back to the cast 'line-of-type.' The mould-wheel, in returning to position after having ejected the metal, forces the line or bar out into a receiving galley, where a little automatic arm holds all the lines in position until the 'take' is full—say one hundred lines or so. Then the operator lifts it out, sends it away for proof, and starts at once on his next 'take.' The movement is continuous. While he is setting one line of type by his keyboard, another is being cast, and the matrices are being redistributed as fast as he can use them. At the side of his keyboard is a little lever by which he introduces space-bands to divide the words. These bands are of tapering thickness, so that the spaces can be made as close or as wide as desired, and all is done as smoothly and effectively as if by the human hand. This automatic justifying is a thing that used to be accounted an impossibility, but it is done, and all because matrices are used instead of metal types.

" But it is practically impossible," says the writer of the article, " by mere verbal description to give an accurate representation of this marvellous machine, which comprises two thousand separate pieces of mechanism. It is a combination of the ideas of many minds adjusted to this particular purpose. Seated at his keyboard the modern printer is both machinist, typesetter, justifier, type-founder and type-distributor. Motive power is supplied to him by shafting from some central steam or gas engine, and all he has to do is to manipulate his keyboard and keep his melting pot supplied with metal, while, of course, using his eyes to see that the right matrices are coming into position. The old typesetting machines required three operators, one

for the keyboard, one to keep up the supply of type, and one to 'justify' the lines."

We have thus extensively extracted from, or rather reproduced, the descriptive portions of the article referred to, because of the lucid and instructive description furnished of the highly organized and very complex machine called the "Linotype," and because of the great difficulty we would have of conveying an adequate description of the combination and construction of the machine and of its manner of operation, to those who had never seen it in action. It may be that the statements in regard to the number of patents embodied in the combination, and the number of pieces of separate mechanism contained in the machine, are excessive, though we have no *data* at hand to show any such error, if there be such. Patents to Mergenthaler were granted in 1885 and 1886, and the proof in this case shows that the changes, modifications and improvements in the machine have been constantly going on since the date of the original patents.

By the proof of this case it is shown, that Mergenthaler is the original inventor of line-casting machines, as we now have them, and that he has invented and developed two general types or kinds of these machines, having distinguishing mechanism and methods of operation, the one from the other. The first of these, known as the "band machine," employs matrix bars, connected to and forming an integral part of the machine, each bar bearing on its face or edge the whole assortment of letters or characters used in the machine. In this machine the matrices are assembled in line by a keyboard mechanism, which, on bringing each matrix into line, at the same time stops it at the proper height for the letter or character required. Upon this being done, the line is justified and the casting operation performed, and then the matrices are returned to their original position ready for use in the operation of casting the next line of type.

The other machine, known as the separate or single char-
acter matrix machine, and which is in most general use,
has, as a distinguishing feature, a separate matrix for each
separate letter or character in the assortment used in the
machine.    The matrices are stored in a magazine, each
letter in its own compartment, and the several matrices
necessary to form a composed line are discharged from their
respective magazine compartments and assembled in line
by means of mechanism operated by a keyboard.    After
being thus assembled the line of matrices is moved to the
casting point and is there justified and the casting opera-
tion performed, after which the matrices are automatically
distributed and returned, each to its respective compart-
ment in the magazine.    These machines have been used
with great success.

Since the construction and use of these two different types
of machines, Mergenthaler has attempted to develop an in-
termediate type of machine, that containing the combina-
tions described in the issues of this interference.

Such was the state of the art or the invention of the
linotype or line-casting printing machines at the time
when, and in view of which, the parties to this controversy
claimed to have completely conceived and disclosed, and
illustrated by drawings, the invention as embodied in the
machine containing the combinations described in the is-
sues of interference.    That Scudder, the junior party, was
entirely familiar with the pre-existing machines invented by
Mergenthaler, would seem to be clear; for the proof shows
that he was, from the year 1888 to some time in the latter
part of the year 1891, in the employ of the Mergenthaler
Company at Brooklyn, and was, during a larger part of that
time, superintendent of the Mergenthaler factory at a liberal
salary.    As superintendent of the factory, Scudder was doubt-
less familiar with the older form or band machine, and it
appears that he was well acquainted with all the details of
construction and operation of the single-character matrix

machine, which was being introduced into the newspaper and book printing houses of the country. To what extent he made his knowledge thus acquired available in the conception of his alleged invention, which led to his drawings of May, 1890, and his subsequent construction of his line-casting machine, involved in the issues of these cases, is more a matter of rational supposition than of positive proof. Doubtless he had in mind the previous state of invention, and his effort was so to differentiate his conception as to make a machine that would be independent in structure and operation from those of Mergenthaler's invention. And the question is, did he accomplish this object at a time and in such complete practical form, as to entitle him to priority in the present issues of interference?

A complete conception, as defined in an issue of priority of invention, is matter of fact, and must be clearly established by proof. The conception of the invention consists in the complete performance of the mental part of the inventive act. All that remains to be accomplished, in order to perfect the act or instrument, belongs to the department of construction, not invention. It is therefore the formation, in the mind of the inventor, *of a definite and permanent idea of the complete and operative invention, as it is thereafter to be applied in practice,* that constitutes an available conception, within the meaning of the patent law. 1 Robinson on Patents, Sec. 375.

"He who first conceives *and gives expression to the idea of an invention in such clear and intelligible manner that a person skilled in the business could construct the thing,* is entitled to a patent, provided he uses reasonable diligence in perfecting it." *Machine Co.* v. *Harvester Works,* 42 Fed. Rep. 152, 157. Or, as said by Mr. Commissioner Leggett, in *Chapman* v. *Candee,* 2 O. G. 245, "It is for him (the party upon whom the *onus* rests) to prove priority of invention, and he may do it by establishing either that he was the first to conceive the

idea *and the mode of putting it into practice,* and used reasonable diligence in adopting and perfecting it, or *that he actually perfected and reduced the invention to practice prior to the date of the application* of the opposing party to the issue." Or, as more fully stated by the same learned Commissioner, in the case of *Cameron & Everett* v. *I. R. Brick,* 6 C. D. 171, p. 89, "The point of time at which invention, in such sense as to merit the protection of law, dates is neither when the first thought of it is conceived, nor when the practical working machine is completed, but it is when the thought or conception is practically complete; when it has assumed such shape in the mind that it can be described and illustrated; when the inventor is ready to instruct the mechanic in relation to putting it in working form; when the 'embryo' has taken some definite form in the mind and seeks deliverance, *and when this is evidenced by such description or illustration as to demonstrate its completeness.* . . . The true date of invention is at the point where the work of the inventor ceases and the work of the mechanic begins. Up to that point he was inventing, *but had not invented,* and he must have invented before the law will come to his protection."

In the case of *Voelker* v. *Gray,* 30 O. G. 1091, Mr. Commissioner Butterworth, in defining what will constitute complete conception, within the meaning of the patent law, says that the party claiming "must have been first to conceive the thing in controversy; not merely to conceive it possible to construct a device which would produce the result sought. . . . The conception must not be the result to be obtained, *but the means (which is the patentable thing) to produce that result.* As long as there is a missing ingredient, in the absence of which the means utilized is a failure, the desired result unattainable, the invention is incomplete. . . . That of which the law takes notice is not the maturing but the matured conception which can materialize in an operative device; but it very frequently

occurs that the inventor confounds his original device and later conception and gives the latter the date of the former, and does it innocently."

It follows from the principles thus enunciated that the date of the conception is the date when the idea of means, including all the essential attributes of the invention, becomes so clearly defined in the mind of the inventor as to be capable of exterior expression. 1 Robinson on Patents, Sec. 380. And it is settled, both by practice and express decision, that such exterior expression of the mind of the inventor, when relating to machinery, may be by exhibits either in the form of drawings or by model, so as to lay the foundation of a claim to priority, if thereby the invention be made sufficiently plain to enable those skilled in the art to understand it. *Webster Loom Co.* v. *Higgins,* 105 U. S. 580, 594.

Now, upon the application of these well-settled general principles, the *onus* of proof being upon Scudder, the question is, whether, upon the facts of the case, the *prima facie* effect of the applications filed by Mergenthaler has been overcome, and the priority of invention, as matter of fact, has been shown by Scudder, in plain, definite and comprehensive terms?

The fact of conception by an inventor, for the purpose of establishing priority, can not be proved by his mere allegation, nor by his unsupported testimony, where there has been no disclosure to others or embodiment of the invention in some clearly perceptible form, such as drawings or model, with sufficient proof of identity in point of time. For otherwise such facile means of establishing priority of invention would, in many cases, offer great temptation to perjury, and would have the effect of virtually precluding the adverse party from the possibility of rebutting such evidence. Hence it has been ruled in many cases that the mere unsupported evidence of the alleged inventor, on an issue of priority, as to the fact of conception and the time thereof, can not be received as sufficient proof of the fact of prior conception.

*Hisey* v. *Peters*, 6 App. D. C. 73; *Stevens* v. *Putnam*, 18 O. G. 520; *Farmer* v. *Brush*, 17 O. G. 150; *Brungger* v. *Smith*, 62 O. G. 1511. But any full and accurate description of the invention, either in words or drawings or by model, if it be of a machine, or even an unsuccessful effort to embody the conception when the effort discloses that the idea was complete, will suffice, although the attempt to represent it may have failed. In the absence of all other proof, the date of the application for a patent, if containing a complete description, is taken as the date of the conception. 1 Robinson on Patents, Sec. 380. But if drawings be exhibited and relied on, as evidence of the conception of the invention, they must show a complete conception, free from ambiguity or doubt, and such as would enable the inventor or others skilled in the art to reduce the conception to practice without any further exercise of inventive skill. Id.

In his preliminary statement Scudder alleges that he conceived the invention claimed by him, and made disclosure thereof, in February, 1889; that he made experimental matrices in November, 1889, and also began an experimental machine, embodying the subject-matter of some of the counts of interference in December, 1891; and that he finished such machine in February or March, 1892; and that he subsequently built a second and a third machine. He also alleges that he made drawings in May, 1890, which he has produced as evidence of *a completed conception of the invention at that time.* But there is no evidence legally sufficient, apart from the testimony of Scudder himself, to show clearly and definitely the fact of conception of the invention involved in the present issues of interference, prior to May, 1890, the time when the drawings exhibited as evidence of conception were made. The case of Scudder must, therefore, depend largely, if not entirely, upon the sufficiency of those drawings as evidence of completeness of conception. For, as all the work of embodying the invention in a working machine was done after Mer-

genthaler *had filed his applications*, Scudder can not avail himself of such subsequent work to establish prior conception to Mergenthaler's applications. If, however, those drawings are shown to be sufficient to establish a complete conception of the invention in issue in May, 1890, that date being prior to the filing of Mergenthaler's applications, and Scudder can show that he has used reasonable diligence in reducing' such conception to practical form, then he is entitled to the position of prior inventor, and, consequently, to a patent for such invention.

Now, as we have shown that there is no sufficient evidence of conception of the invention in issue prior to May, 1890, do the drawings of that date, relied on by Scudder to prove conception of the invention in issue, so clearly and distinctly show to any one skilled in the particular art the mechanism adapted to perform the functions which are claimed to be novel and useful, as to enable such person to understand and practically use such invention? There is a third sheet of drawings alleged to have been made by a draughtsman employed by Scudder, for the purpose of showing and illustrating the completion of the conception; but as these drawings were not made until December, 1891, after the filing of the applications of Mergenthaler, they are not evidence *per se* of priority of conception, and, while the testimony of Scudder may be material to explain what is shown in the drawings, his testimony alone, as we have seen, is not competent or admissible to establish the fact of priority of conception.

In order to identify them and to show what the drawings of 1890 expressed and illustrated, and that they were sufficient to enable a skillful mechanic to understand and use them, Scudder produced as a witness a person named Sytz, a mechanic familiar with the construction of linotype machinery, and who had been, for a considerable time, employed with Scudder in the Mergenthaler workshops at Brooklyn, and occupied therein a prominent position. This

witness identified the drawings of 1890, and thinks they were made by Scudder in June or July, 1890; and that they represented and illustrated a key-board and magazine, and a means of assembling the matrices into line. He also says that one of the drawings showed a distributing mechanism. He testifies that Scudder entered upon the work of building a line-casting machine, embodying the plan which he had devised and showed in the drawings referred to, in December, 1891; that he saw said machine about May or June, 1892, and it was not then completed. He saw a completed machine embodying the plan in November, 1892. But, in answer to cross-question 122, the witness says that he does not think the machine was running; it was only partly completed; in fact, says the witness, " if I remember right, the base stood on a couple of wooden saw-horses." In answer to further question the witness replied that: "While it was only a partly completed machine, it had the keyboard and magazine on and a means for assembling the line, also means for transferring the line. The distributer, while they said that they had it working, was not on the machine when I saw it; it was on the bench for repairs or changes, and I do not remember whether there was any means for casting a line. I do not think the matrices had any characters upon them at that time." He further testified in regard to the drawings of 1890, that they did not show many of the essential things to completeness of the machine in issue. By cross-question 82 the witness was asked, " Did the 1890 drawings, when you last saw them in 1890, represent any means for guiding the matrices falling from the magazine at different points to one and the same point at the end of the line, or any means for transferring the line to the casting point, or any casting mechanism, or any spacing or justifying mechanism of any kind, or any means for transferring the line to the distributer, or any means for releasing the assembled matrices and lining them up with their ends in their required rela-

tion to enter the distributer, or any means for advancing them through or along the distributer to the magazine, or any driving connections?" The answer was, "No, sir; the drawings did not show such things."

The witness also testifies that there were essential parts and connections in the Scudder machine not shown in the drawings of 1890, and were not embodied in the Mergenthaler machines. By cross-question 114, the same witness was asked: "Am I to understand from your testimony-in-chief that in the Mergenthaler machines built in the Brooklyn factory there were line-assembling devices, carriages for conveying the composed line and elevating devices to the distributer, or devices for feeding the matrices through the distributer which were constructed and arranged in forms suitable for use with the devices shown in the May, 1890, drawings?" The answer was: "No, sir."

This same witness, a skilled mechanic in the art, further testifies that, although he was familiar with these drawings of 1890, he could not understand them, or Scudder's explanation of them, without sketches of the different parts of the contemplated machine.

Cross-question 58. "During 1890, and prior to August of that year, did you see any other drawings of Mr. Scudder's similar to the drawings in evidence to which you have referred?" Answer. "No drawings; simply sketches which he made so that I could understand the parts he was explaining."

Cross-question 59. "You refer, I suppose, to sketches other than these 1890 May drawings?" Answer. "Yes; freehand sketches which he would make on the margin of a newspaper or an envelope or something of that sort."

Cross-question 60. "Why were these sketches necessary if you were already familiar with the May, 1890, drawings?" Answer: "More to explain in detail those parts which I could not understand from his conversations."

Indeed, this witness frankly admits, though a skilled

mechanic, with special knowledge in the construction of linotype machines, that he can not now understand the drawings of May, 1890, though Scudder had previously explained them to him, both orally and by means of freehand sketches. This is shown in the following cross-examination of the witness:

Cross-question 86. "Referring to your answer 33, am I right in understanding that the parts and movements therein named were things which Mr. Scudder proposed to develop, but which were not shown in any drawings which you saw in 1890?" Answer. "The key-board was shown, and a means for releasing the matrices and bringing them down to an aligning bar, and the distributing wires are shown, *but the rest of it was only shown in such sketches as he made for me so that I could understand his plans, and were afterwards destroyed.*"

Cross-question 110. "Am I correct, then, in understanding that you do not recollect the details of the matrix-feeding mechanism, or how it was that the matrices were to get into the magazine-channels leading to the point of delivery, or how the pawls acted in delivering them?" Answer. "You are."

Cross-question 111. "Are you not, as a skilled mechanic, accustomed to working from drawings, able to determine the construction and operation proposed in reference to the May, 1890, drawings, and in the light of the fact that you saw them made and repeatedly discussed them with Mr. Scudder?" Answer. "I consider that I am capable of understanding drawings, and I think that I understood these drawings at the time they were made, but there were a great many little details which are not on the drawings, and if they were explained to me I have forgotten them."

Cross-question 112. "I suppose you refer to details which it would be necessary for you to have in mind or before you in order to understand the construction and operation of the parts shown in the May, 1890, drawings?" Answer. "I do."

Similar answers were made to other interrogatories.

But Scudder himself was a witness in his own behalf, and testified as to his relations with and as employee of the Mergenthaler Factory Company, during the time that he was engaged in conceiving and experimenting with his invention, from 1889 to 1892; and he testified as to the time and circumstances of his making the drawings of May, 1890. He described his invention as developed in his line-casting machine of 1892, which did *not* in fact embody all the parts and connections and conform to the drawings of 1890. He says, "in December, 1891, I engaged a draughtsman, whose name was Baker, to make drawings more fully illustrative" than the drawings of 1890. · He was then asked for what particular purpose were the drawings of which the one he then produced·was made in 1891. His answer was, "For the purpose of building a working model from it." The next question was, "Was that model built?" The reply was, "It was." He then stated where and when built. And in answer to these latter questions, he said the work on the machine·"was actually begun in December, 1891, and a working model, as far as the keyboard, magazine, and assembling devices and distributer were concerned, was completed in March, 1892." In answer to another question, "Did that model or experimental machine, as completed in March, 1892, embody the mechanism illustrated in your May, 1890, and your December, 1891, drawings?" he said: "It did, largely, but not wholly. The making of some of the parts were changed in order to manufacture more easily, and others in detail to get better and more accurate results; but no departure was made from the original drawings, except in detail." He was next asked whether anything had been done preparatory to the commencement of the work on the experimental machine—begun in December, 1891—whether any preparatory work had been done before that time? He answered, "Yes, there was. From time to time I had made different lots of experimental matrices, and had talked over

with those in whom I had confidence, different details and plans for operating a machine of this class, and had, as far as I could practically do so, worked out the details of this machine. Owing to the nature of the business I was employed in at that time, and the fact that it was being pushed almost night and day, left me with but slight opportunity to engage myself wholly upon a work of this kind, as, *owing to the entire change from the existing machines of this class, an entire departure from the fixed plans of doing this work had to be made. In fact, every movement in the machine had to be designed especially for it, and no one of the then known means of assembling and distributing matrices or matrix bars was applicable to my invention.* A new system of storing the bars, releasing, adjusting them endwise, and assembling them beside each other, handling the composed lines, preparing them for distribution and distributing them, had to be made, as the fact that the matrix bar was independent and had several characters upon it, required entire new mechanism to handle it. This work, while it was considerable, was constantly going on at such times as I could spare from the business I was then engaged in." And upon a very lengthy and searching cross-examination of Scudder, it is very fully shown that the drawings of May, 1890, in many important particulars, are wholly insufficient and inapplicable in point of completeness, as means of showing and illustrating all the parts and connections of the invention involved in the present issues of interference. This cross-examination, though of great importance as evidence, is of too great length to be inserted in this opinion; but such parts of it as relate to the drawings of 1890 and their want of sufficiency to illustrate the issues of interference (those parts which have been printed in the brief of appellant), will be appended hereto as a foot-note by the Reporter.*

---

*X-Q. 109. When did you first have drawings showing the machine complete with all the parts necessary for casting line bars from matrices each bearing a number of characters? I mean drawings from

It is manifest from all the evidence, and especially that of Scudder himself, that the drawings of 1890 are in many essential particulars defective and wanting in completeness as means of showing and illustrating the invention involved in the present controversy; and such defect and want of completeness in the drawings can not be aided, and the defective drawings made available by construction, or by reference to

---

which a machine could be constructed without the addition of working parts other than those shown in the drawing.

(Objected to by counsel for Scudder as involving parts of a line-casting machine over and beyond the mechanisms involved in these interferences.)

A. Some time during July, 1892.

X-Q. 110. When did you first complete drawings showing a line-casting machine having therein suitable operating mechanisms and a series of matrices, each having several different characters, less in number than the assortment in the machine, and a distributing mechanism by which the matrices are returned to the magazine through a path different from that pursued in the course of composition?—A. If that question relates to the assembling and distribution of matrix bars for the purposes of casting a line, such drawings and plans were made in May, 1890, and if you mean a detail or working plan suitable for use in the hands of mechanics, such plans were subsequently made in December, 1891, also in January, 1892.

X-Q. 111. Do the drawings of May, 1890, to which you refer, contain any means for presenting the matrices to the distributor?—A. They did not; no, sir.

X-Q. 112. Did the drawings of May, 1890, contain any means for advancing the matrices through or along the distributer to the magazine or place of storage?—A. They did not; no, sir.

X-Q. 113. Both of these devices are necessary to a practical or commercially operative machine, are they not?—A. They are; yes, sir.

X-Q. 114. Do the drawings of May, 1890, show any assembling box or device by which the matrices successively delivered are inserted one after another at the end of the line?—A. They do not; no, sir.

X-Q. 115. Do the drawings of May, 1890, show any means for advancing the line endwise as composition progresses in order to leave room for the incoming matrices as they fall one after another?—A. They do not.

X-Q. 116. Do the drawings of May, 1890, show any means for preventing a matrix discharged from the magazine from falling on top of the matrices already delivered into the line?—A. They do not.

X-Q. 117. When you came to construct a working machine you

the prior state of the art, or of the then existing linotype or line-casting machines, as seems to have been supposed by the Commissioner of Patents, upon the principle stated in the case of *Webster Loom Co.* v. *Higgins*, 105 U. S. 580.    Scudder

found it necessary to provide means for the purposes named in the last three questions, did you not?—A. I did; yes, sir.

X-Q. 118. Do the drawings of May, 1890, show any means for preventing the rebound or vertical reaction of a matrix when dropped into the line?—A. They do not; no, sir.

X-Q. 119. When you built a working machine it was found that a device for this purpose was necessary, did you not?—A. In order to insure speed and accuracy; yes, sir.

X-Q. 120. Do the drawings of May, 1890, show any means whatever for clamping or confining the line of matrices in course of composition?—A. No, sir; they do not.

X-Q. 121. Do the drawings of May, 1890, show any means for operating the aligning bar which maintains the longitudinal adjustment of the matrices?—A. The aligning bar was a fixed bar or rib corresponding in size to the aligning notches of the matrices.    Such bar is shown.

X-Q. 122. Do the drawings of May, 1890, show any means whatever for casting type bars against a composed line of matrices, or for presenting the composed line of matrices in position to co-operate with a casting mechanism?—A. It did not; no, sir.

X-Q. 123. Do the drawings of May, 1890, represent any provisions of space or means for introducing spacers into the line in course of composition or for adjusting spaces in the line to effect justification?—A. They do not; no, sir.

X-Q. 124. In the drawings of May, 1890, what provision, if any, is shown for confining or transferring the composed line of matrices in the manner which would be necessary to admit of a type bar being cast against it?—A. There are none shown.

X-Q. 125. Assume the parts to be constructed in strict accordance with the May, 1890, drawings so far as they go, would they, in your opinion, be practically operative?—A. As far as they go, I believe they would.

X-Q. 126. Did you ever construct any model or machine with the matrix-discharging mechanism in strict accordance with the May, 1890, drawings?—A. I did nearly, but did not complete the same far enough to test it, as I struck what I thought was a better scheme.

X-Q. 127. Do the drawings of May, 1890, show the shape of the matrices which you purposed to use with the parts therein shown?—A. They do not.

X-Q. 128. Referring to the May, 1890, drawing, am I correct in understanding that the magazine pawl $q$ has one set of teeth on the

has undertaken to invent and construct a machine essentially different from the pre-existing linotype machine of Mergenthaler; not simply a mere improvement upon the previous invention. It is necessary for him, therefore, to furnish such full, clear and definite drawings of his invention as will enable any person skilled in the art of construction of such

lower arm to engage the lower ends of the matrices in one channel and also teeth on the under side of the upper arm to engage the upper ends of the same matrix?—A. You are correct.

X-Q. 129. Where is the shape of the matrices which you proposed to use shown in connection with your evidence, if at all?—A. I think the December, 1891, drawing was the first drawing of this matrix, although I must have at different periods made different sketches and drawings of the same matrix for the purpose of making those matrices which I have termed experimental matrices, and which were made with a view of determining the final shape to be made.

X-Q. 130. Am I correct in understanding that in the structure shown in the May, 1890, drawings there was to be in each magazine channel leading to the front of the machine a row of vertical matrices engaged at their upper and lower end by the respective teeth to the pawl *q* and separated slightly by these teeth from each other?—A. You are right; yes, sir.

X-Q. 131. What, if anything, is shown in the May, 1890, drawings to prevent the matrices from moving back with the pawl frame *q* when it retreats?—A. There is nothing shown in the May, 1890, drawings at all to prevent that; it was my intention to place in the partitions of the magazine fingers which were spring-pressed, which would engage the matrices and retain them when once thrown forward. This device I did subsequently make.

.          .          .          .          .

X-Q. 133. But neither of the feed devices to which you refer as subsequently made were like that in the May, 1890, drawing?—A. I substantially constructed the magazine with pawls similar to those shown in the May, 1890, drawings, the only difference being that the little tits or projections on the pawls were inclined to allow them to ride under and over the matrix bars. This magazine with the pawls did work and worked fairly satisfactory, but I later substituted for it a better device.

.          .          .          .          .

X-Q. 136. In a machine of the class here in interference, it is necessary, is it not, after the cast has been made from the line of assembled and longitudinally adjusted matrices, to release the matrices and permit them to move endwise in relation to each other

machines to reduce his invention to practical form.  But this he failed to do.  To say nothing of the defects and inadequacies of the drawings, admitted to exist by Scudder himself, and his witness, Sytz, two expert witnesses, both skilled in the art of construction and in the use of drawings, testify that the drawings of May, 1890, are so defective as not to be understood by mechanics.  Mr. Crane, one of these expert witnesses, sums up the condition of these drawings thus: "To recapitulate, the May, 1890, drawings afford no

---

until they line up ; or, in other words, bring their distributing ends or hooks into proper relations to engage the distributing devices?— A. Such action is necessary.

X-Q. 137. Do the May, 1890, drawings show means for thus releasing or lining up the matrices preparatory to distribution?—A. They do not.

X-Q. 138. You have referred, in connection with the May, 1890, drawings, to bale rods on opposite sides of the key-bars *e* and to the necessity of means for the reversing the motion from the bales on one side as communicated to the matrix stops.  Are these connections shown in the drawings?—A. They are not.  But they are such that any skilled mechanic would have no trouble in applying.

(The last clause objected to as irresponsive and voluntary.)

X-Q. 139. Are any means shown in the May, 1890, drawings for moving the detents *k* and the pawl frame *q* in the reversed directions from those in which they are moved by the cams?—A. They were to be provided with springs as stated in my description, although the drawing does not show them.

X-Q. 140. Do the May, 1890, drawings show any means for restoring the key-bars *e* to their stepped position on the roller after being elevated?—A. The position of the spring which is attached to the key-bar *e* was to be located at such place that when elevated it also had tension forward which threw it onto the roller.  The drawings of May, 1890, do not define this position clearly.

X-Q. 141. In the drawings of May, 1890, what is supposed to be represented by the sinuous line leading upward from the letter *f* to the key-bar *e*?—A. It is supposed to be a spring.

X-Q. 142. To what is it attached at the upper end?—A. The key-bar *e*.

X-Q. 143. In the drawings of May, 1890, is Fig. 2 a view of the magazine from the front or the rear?—A. It is supposed to be from the front.

X-Q. 144. In this drawing, if I understand it, the rods or guides 11 lead to the different compartments of the magazine; for example,

· 11 Ct. App.—20

indication that they represent a line-casting machine, and if they do claim to represent such a mechanism they are destitute of the greater part of the essential elements of such a machine, and the parts which they do exhibit are incomplete, inoperative and unsuited to perform the functions which belong to such parts."

And Mr. Brevoort, the other expert witness, after pointing out in what respects the drawings of May, 1890, failed to show a conception of the various combinations of the issues in controversy, says: "It will thus be seen that the drawings, sheets 1 and 2, do not show to a person looking at them any of the combinations which are set forth in the four interference issues which I have been considering. No one looking at the drawings would obtain therefrom the information contained in the combination, nor would he find or have

---

the bottom guide to the first compartment on the left, the guide next above to the next compartment to the right for longer matrices, and so on through the series.—A. You are right; yes, sir.

X-Q. 145. Referring still to these May, 1890, drawings, I observe that they are not dated, and apparently not witnessed. Can you say with certainty when they were completed in their present shape? —A. They were completed fairly close to that period.

X-Q. 146. To what persons, if any, were these May, 1890, drawings exhibited and explained in detail at or about the time they were made?—A. To E. A. Sytz, Brooklyn.

X-Q. 147. To any other person?—A. Not at that time.

X-Q. 148. When and to whom were the May, 1890, drawings next exhibited and explained after that exhibition to Sytz?—A. I think they were next shown to Mr. L. G. Hine, of Washington, about November, 1891.

X-Q. 149. Is the Sytz referred to the one who was then and is now a foreman in the Mergenthaler shop in Brooklyn?—A. He is; yes sir.

.          .          .          .          .          .          .

X-Q. 157. You understood, did you, that my reference to the May, 1890, drawings during my entire examination to-day was to the two sheets which you have offered as exhibits?—A. I did; yes, sir.

X-Q. 158. When did you first have drawings of a line-casting machine as a whole in which the combinations forming the subjects matter of the two interferences, 16,233 and 16,279, were incorporated?

(Counsel for Scudder asked whether by this question is intended a

exhibited to him the combinations and the elements of the combinations which are set forth in the various issues."

It must be borne in mind that we are not considering as evidence, to affect the question of priority of invention, Scudder's completed machine of 1892; but we are considering the sufficiency of the drawings of May, 1890, as evidence of the completed conception of Scudder of the subject-matters of the issues of the interference *at the time that the applications* of Mergenthaler were made. And, as we have seen, these drawings are, in many essential respects, defective and insufficient as proof to establish the claim of priority of invention.

Upon the whole case, and each of the cases, we entirely concur with the conclusion reached by the examiners-in-

---

machine as a whole, including casting and line-ejecting mechanism and their appurtenances.)

(Counsel for Mergenthaler replies that he includes within the question whatever is necessary to make up the "line-casting machine" specified in the issues in interference.)

A. I think the latter part of July, 1892.

X-Q. 159. Then, if I understand you correctly, it was in July, 1892, that you first had drawings showing a line-casting machine having a series of matrices, each having several different characters, less in number than the assortment in the machine, a distributing mechanism by which the matrices were returned to the place of storage, and suitable operating mechanism. Is that correct?—A. You are correct.

.        .        .        .        .        .        .

X-Q. 161. When did you first complete drawings showing in combination a series of matrices each with a number of characters at different points in their length, a composing mechanism for assembling said matrices with their selected characters in line, a bed or support for the line with a rib to prevent the matrices from shifting endwise in relation to each other after assemblage, and means for shifting said composed line along said rib or guide to the required point?—A. Not until July, 1892.

X-Q. 162. Did you previous to this time, July, 1892, made any drawings showing the combination of mechanism recited in a previous question except as to the matrices?—A. I did not; no, sir.

X-Q. 163. I assume you understood my last two questions as covering drawings which were made either by you or for you?—A. Yes.

chief; and their conclusion being stated in clear and explicit terms, we shall adopt it in the terms employed by them. They say:

"From the drawings themselves, and from the evidence of Sytz, and from the evidence of Scudder, we think it impossible to say that Scudder had at the date of these drawings any definite conception of the actual arrangement of the parts necessary for storing the bars, releasing them, adjusting them endwise, assembling them, handling the composed lines, preparing them for distribution, and distributing them. And the essence of the invention involved in these issues lies in the arranging and inventing these parts to perform these necessary functions, although most of them were clearly suggested in one or the other of the old machines.

"These drawings, when taken in connection with the drawings of his application and the actual embodiment of the idea in a working machine, *show at most* that he at that time had the germ of the idea which at some subsequent time was matured into the form shown in the present embodiment (that is, the machine of 1892), but this inchoate and incomplete idea is not sufficient." That is to say, not sufficient to show complete conception prior to the dates of the filing of the applications of Mergenthaler.

The views we have expressed and the conclusion resulting therefrom apply alike to both cases of interference, No. 16,233 and No. 16,270. The two interferences have been conducted and considered as one case; the exhibits, testimony, and briefs, being the same in both cases; and both are subject to the same conclusion.

2. With respect to the question of due diligence by Scudder, the examiners-in-chief were of opinion that due diligence had not been exercised by Scudder since May, 1890, the time of making the drawings, in adapting and perfecting the invention alleged to have been conceived by him at that time. But, in the view we have of the principal question, we deem it unnecessary to express an opinion

upon the question, whether due diligence was exercised by Scudder or not. That question is immaterial.

It follows that the decisions of the Commissioner in both cases of interference must be reversed; and the clerk of this court will certify this opinion and the proceedings in both causes of interference to the Commissioner of Patents, that they may be entered of record in the Patent Office, according to law; and it is so ordered.

*Rulings appealed from reversed, and causes remanded.*