REYNA, Circuit Judge,
dissenting.
Inventorship is perhaps the most fundamental question in patent law. The instant an inventor conceives her invention is the moment in which vests her right to a patent, thus perfecting her constitutional right to exclude.
The question on appeal is whether Dr. Dawson conceived his invention while employed at the University of California, San Francisco (“UCSF”), or instead after he joined InSite, a pharmaceutical manufacturer. The majority concludes that Dr. Dawson conceived his invention while working at InSite. I disagree.
The record before us demonstrates that Dr. Dawson possessed a definite and permanent idea of his complete and operative invention when, in the summer of 1997, he delivered a related presentation at a conference of the World Health Organization (“WHO”). At that time, Dr. Dawson was employed by UCSF, not InSite. Consequently, I find that Dr. Dawson, through UCSF, satisfied his burden of demonstrating prior conception. I therefore respectfully dissent.
Conception
Conception is the legally operative moment of invention. It consists of the “formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice.” Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1376 (Fed.Cir.1986). The law thus recognizes conception in the instant “when the inventor has a specific, settled idea, a particular solution to the problem at hand.” Burroughs Wellcome Co. v. Barr Labs., Inc., 40 F.3d 1223, 1228 (Fed.Cir.1994). The inventor’s settled solution must provide the ordinarily skilled artisan with enough guidance to “understand the invention,” id., and its structure, Amgen, Inc. v. Chugai Pharm. Co., 927 F.2d 1200, 1206 (Fed.Cir.1991). The inventor must be able to “describe h[er] invention with particularity.” Burroughs, 40 F.3d at 1228; Amgen, 927 F.2d at 1206 (Conception requires that the inventor “be able to define” the compound “so as to distinguish it from other materials, and to describe how to obtain it.”). Finally, the inventor must appreciate “the fact of what [s] he made,” Dow Chem. Co. v. Astro-Valcour, Inc., 267 F.3d 1334, 1341 (Fed.Cir.2001), that is, she must “appreciate that which [s]he has invented.” Invitrogen Corp. v. Clontech Laboratories, Inc., 429 F.3d 1052, 1063 (Fed.Cir.2005).
The facts demonstrate that Dr. Dawson had a settled idea to solve a particular problem when he gave his presentation at the 1997 WHO conference. Dr. Dawson’s presentation was entitled, “Potential Use of Topical Azithromycin in Trachoma Control Programmes,” and it was accompanied by a report. Dr. Dawson disclosed in his presentation and report the potential benefits of his new, topical azithromycin formulation.
Dr. Dawson presented the problem: “Aqueous (water-based) eye drops yield a diminished effective dose, and azithromycin has a low solubility in aqueous solutions.” Dr. Dawson then revealed his solution: “[Tjhere are now several vehicles that are administered as a drop and persist in the eye, releasing [the] drug over a long period of time (Table 1).” He pro *1358 duced a table entitled “Topical drug delivery to the eye” that identified five such drug delivery vehicles. The table included Durasite, a delivery depot comprised of acrylic acid polymers.
Dr. Dawson further disclosed the effective dosage for his azithromycin formulation. Dr. Dawson suggested that his topical azithromycin ointment should use the same dosage known for erythromycin, an alternative antibiotic for treating the eye. “[0]ne obvious preparation,” he said, “would be an ointment like the 0.5% eryth-romycin ointment.” In the patent Dr. Dawson would later obtain, six of the fourteen formulations specify precisely this amount, that is, 0.5%, by weight, azithromycin.
By February 1998, Dr. Dawson was working with InSite, presumably to explore commercial production of his azithromycin ointment. UCSF was unaware of Dr. Dawson’s collaboration with InSite. In March 1999, Dr. Dawson and Dr. Bowman of InSite jointly filed a patent application relating to an azalide antibiotic ointment for treating infections of the eye. This application matured into the '113 and '443 Patents. Drs. Dawson and Bowman assigned the '113 and '443 Patents to In-Site.
After the patents issued, UCSF provoked an interference. UCSF claimed that Dr. Dawson had conceived of the patented invention before joining InSite, while still at UCSF.
CONCEPTION OF THE COUNT
In an interference proceeding, a “count” defines the interfering subject matter and corresponds to a patentable invention. See Slip Track Sys., Inc. v. Metal-Lite, Inc., 304 F.3d 1256, 1263 (Fed.Cir.2002). The party seeking to establish prior conception must show possession of each feature recited in the count. Coleman v. Dines, 754 F.2d 353, 359 (Fed.Cir.1985). Here, the Board defined the count in the '729 Interference as follows:
A process for treating an eye, comprising:
topically applying an azalide antibiotic to an eye in an amount effective to treat infection in a tissue of the eye,
wherein said topically applying comprises supplying a depot of a composition containing said azalide antibiotic on the eye.
Board Op. 12. Dr. Dawson’s WHO presentation and accompanying report teach each of the limitations, and they establish that he had possession of each recited feature.
First, both of the WHO references disclose treating an eye. The WHO presentation recites, “Reasons for local dosing of the eye,” “effective local dosing of the eye with one daily treatment or less,” “ocular delivery,” and delivery depots “that are administered as a drop and persist in the eye.” Dr. Dawson’s WHO report discloses “ocular delivery,” delivery depots “that are administered as a drop and persist in the eye,” and “allowing the drug to be absorbed by tissues, particularly the conjunctival epithelial cells.”
Second, both WHO references disclose topically applying an azalide antibiotic. Azithromycin is an azalide antibiotic. The title of Dr. Dawson’s presentation begins, “Potential Use of Topical Azithromycin.” The title of the WHO report is “Alternative Vehicles for Ocular Delivery of Topical Azithromycin.” 3812. Dr. Dawson’s entire presentation and accompanying report are directed to topical delivery of azithromycin, an azalide antibiotic.
*1359 Third, Dr. Dawson’s presentation discloses an effective dose. Specifically, Dr. Dawson suggested that his azithromycin formulation would use the same dosage known for erythromycin. “[O] ne obvious preparation,” he said, “would be an ointment like the 0.5% erythromycin ointment.” This dose, that is, 0.5% by weight, is used throughout Dr. Dawson’s patent as a preferred formulation.
And fourth, the WHO presentation and report teach supplying a depot containing the azalide antibiotic. Both references contain the same table listing five alternative delivery depots, one of which is Durasite.[1] Both the WHO presentation and the report disclose “several vehicles that are administered as a drop and persist in the eye” and explain that “the advantage of such a preparation is that the azithromycin would be in contact with the conjunctiva for a prolonged period of time, allowing the drug to be absorbed by tissues.” Listing several alternatives, only one of which is the claimed invention, does not preclude a finding of conception. See In re Jolley, 308 F.3d 1317, 1322 (Fed.Cir.2002) (“But [the senior party] admits that if [the junior party] had proposed in his e-mail a small number of compounds, such as two esters, one inside and one outside the count, then [the junior party] would have established conception of the subject matter of the count — despite the inclusion of subject matter beyond the scope of the count.”); see also Snitzer v. Etzel, 59 C.C.P.A. 1242, 465 F.2d 899, 902-03 (1972) (“Our principal difficulty with the argument is that we fail to see the relevance of the listing of several inoperative species when the species claimed is operative and performs as ‘speculated.’ Whether it is labeled ‘discovery’ or ‘speculation,’ appellant’s conception of trivalent ytterbium as a laser-active material is no less his own, no less original, no less important technologically, and, on this record, earlier than appellees’.”).
Dr. Dawson’s WHO presentation and the accompanying report disclose each element of at least the '729 count, and as such, the two WHO references are sufficient to demonstrate Dr. Dawson’s prior conception.
Invention is the WORK of the Mind
The majority discounts Dr. Dawson’s work at UCSF as failing to achieve a fully developed idea of the invention. This conclusion reflects a misapplication of the law of conception to the facts of this case. To demonstrate conception, the law does not require that Dr. Dawson devélop a working physical embodiment of his innovative idea. Indeed,
Invention is not the work of the hands, but of the brain. The man that first conceived the complete idea by representing it on paper, or by clear and undisputed oral explanation, is the first inventor, and to avail himself of the rights or priority the law only requires that he shall use due diligence in embodying his idea in a practical working machine. The sketch need not be a “working drawing.” The conception may be complete, while further investigation, and perhaps experiment, may be necessary in order to embody the idea in a useful physical form.
Edison v. Foote, 1871 C.D. 80, 81 (Comm’r Pat. 1871). While conception thus re *1360 quires “the formation, in the mind of the inventor, of a definite and permanent idea of the complete and operative invention,” Mergenthaler v. Scudder, 11 App.D.C. 264, 276 (D.C.Cir.1897), it does not require reduction to practice.
The point of time at which an invention merits protection under the patent law is neither when the first thought occurs, nor when a practical working embodiment is completed. Rather, conception occurs
when the ‘embryo’ has taken some definite form in mind and seeks deliverance, and when this is evidenced by such description or illustration as to demonstrate its completeness. It may still need much patience and mechanical skill, and perhaps a long series of experiments, to give the conception birth in a useful, working form. The true date of invention is at the point where the work of the inventor ceases and the work of the mechanic begins.
Cameron & Everett v. Brick, 1871 C.D. 89, 90 (Comm’r Pat. 1871).
Here, Dr. Dawson’s WHO presentation manifested an inventive embryo which thereafter sought deliverance. In his presentation, he provided a description sufficient to illustrate the completeness of his invention. All that was left was the work of the mechanic — that is, reduction to practice. This Dr. Dawson was not required to do.
ReduotioN to Peaotioe
After his WHO presentation, Dr. Dawson returned to UCSF and engaged Dr. Chern, a clinical fellow at UCSF, to help reduce his azithromycin ointment to practice. Having already identified Durasite as an appropriate delivery depot, Dr. Dawson suggested that Dr. Chern reach out to Dr. Bowman at InSite, the company that manufactures Durasite.
Meanwhile, Dr. Chern contacted Mr. Leiter, a pharmacist and associate of Dr. Dawson, to prepare a topical azithromycin ointment. Leiter prepared an ointment using azithromycin and a petroleum depot, and he provided several tubes of the ointment to Dr. Chern. The tubes were dated 4 August 1997. Dr. Chern administered the ointment to his own eye and based on this self-dosage he confirmed that petroleum depot was an appropriate vehicle to deliver the topical azithromycin ointment.
In the interference proceeding, the Board considered whether Dr. Chern’s experiment showed reduction to practice before the critical date. The Board held that Dr. Chern’s experiment could not be reduction to practice because Chern had not applied the ointment to an actual infection. The Board based its determination on its construction of “treating” an eye, which it construed as “retarding or suppressing infection in a tissue of’ an eye. Because Dr. Chern had not applied the ointment to treat an actual infection, the Board held that Dr. Chern did not reduce Dr. Dawson’s invention to practice. The Board erred in two fundamental aspects. First, the term “treating an eye” in the preamble of the count is not limiting. Second, “treating an eye” does not require an actual infection.
Generally, a preamble is not limiting “when the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention.” Catalina Mktg. Int’l, Inc. v. Cool-savings.com, Inc., 289 F.3d 801, 809 (Fed.Cir.2002). Nor is a preamble limiting if it “merely gives a descriptive name to the set of limitations in the body of the claim that *1361 completely set forth the invention.” IMS Tech., Inc. v. Haas Automation, Inc., 206 F.3d 1422, 1434-35 (Fed.Cir.2000).
Here, the body of the count recites the complete and operative invention. Indeed the body of the count clarifies what is meant by “treating an eye”: it means “topically applying an azalide antibiotic to an eye in an amount effective to treat an infection.” The count does not require an infection, only an amount effective to treat an infection.
Second, even if the preamble is limiting, the correct construction of “treating an eye” does not require an actual infection. The specification of the '113 Patent explains what is meant by “treating an eye”:
The present invention relates to a process for treating an eye that comprises topically applying an azalide antibiotic to an eye in an amount effective to treat or prevent infection in a tissue of the eye.
'113 Patent col. 2 11. 3-36. This explanation demonstrates clearly that “treating an eye” means “topically applying an azalide antibiotic to an eye.” Although the applied dose must be “effective to treat or prevent an infection,” an actual infection is not required. Cf. Abbott Laboratories v. Baxter Pharm. Products, Inc., 334 F.3d 1274, 1277 (Fed.Cir.2003) (noting that “effective amount” has a customary usage meaning an “amount sufficient” for the intended result); accord The American Heritage College Dictionary 1440 (3d. ed. 1997) (defining treat as “To subject to a process, an action, or a change, esp. to a chemical or physical process or application”); 18 The Oxford English Dictionary 468 (2d. ed. 1989) (defining treat as “To subject to a chemical or other physical action; to act upon with some agent”). The Board’s construction of “treating an eye” in the '729 count was clear error. The Board further erred when it relied on its erroneous claim construction to discount Dr. Chern’s experiment as evidence of reduction to practice.
Post Conception
The question is: because Dr. Dawson’s WHO presentation demonstrated conception and Dr. Chern’s experiment demonstrated reduction to practice, what is left to establish inventorship? The majority opinion leaves open for interpretation whether commercialization is required for full conception.
But conception does not require commercialization, nor does commercialization establish initial invention. On the contrary, the record shows that Dr. Dawson conceived his invention at UCSF. He turned to Dr. Bowman at InSite only for assistance in commercializing his invention.
In February 1998, UCSF submitted a grant proposal requesting funding from the Edna McConnell Clark Foundation of New York for a study of trachoma control strategies. The proposal fully described Dr. Dawson’s invention: a topical azithromycin ointment using the 0.5% dosing and Durasite as a delivery vehicle. The proposal was funded in full. Yet following the proposal, having finished . his inventive work, Dr. Dawson turned to InSite to commercialize his invention. Naming Dr. Bowman at InSite as a co-inventor, Dr. Dawson filed a patent application covering his invention and assigned his rights to InSite.
But nothing in the record indicates an inventive contribution by Dr. Bowman or anyone else at InSite. On the contrary, *1362 the record shows that Dr. Dawson had fully conceived his invention before he began working with InSite. UCSF’s grant proposal in particular demonstrates completion of Dr. Dawson’s inventive work. The record shows that InSite’s contribution was limited to commercialization. I dare not read this record to take away Dr. Dawson’s constitutional right to secure his own invention by virtue of another’s commercialization. To do so would, among other things, invite mischievous entities to lay hidden along the pathways of discovery, and to waylay industrious and deserving inventors, by laying claim to their in-genuities through commercialization. Conception is fundamental to U.S. patent law, and any changes made to our law on inventorship should be considered with caution and foresight.
CONCLUSION
The record in this case belies the majority’s conclusion that Dr. Dawson conceived his invention while employed at InSite. Instead, Dr. Dawson’s WHO presentation and accompanying report demonstrate that, while employed at UCSF, Dr. Dawson possessed a permanent and definite idea of his complete and operative invention. I therefore respectfully dissent.

. The majority characterizes the five alternative delivery depots as “many potential vehi-des.” Majority Op. at 1353.