## COOPER v. HUBBELL.
### Patent Appeal No. 2811.

Court of Customs and Patent Appeals.
Dec. 17, 1931.

H. C. Bierman, of New York City (Charles S. Grindle, of Washington, D. C., and Ellis S. Middleton, of New York City, of counsel), for appellant.

John E. Hubbell, of New York City (Clarence M. Fisher, of Washington, D. C., and W. Brown Morton, of New York City, of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

LENROOT, Associate Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office, awarding priority of invention to appellee in an interference proceeding.

The invention involved is described by the Board of Appeals as follows:

"The subject matter of the issue is a method of fumigating consisting in its most specific aspects of dispersing pulverized calcium cyanide as a cloud of dust in the atmosphere of a confined space in order to kill insects or rodents found therein as on plants, trees or in burrows or buildings. It is essential that the atmosphere of the space concerned have sufficient humidity to decompose the calcium cyanide to liberate hydrocyanic acid vapor which will thus be diffused throughout the atmosphere as generated. It is essential that the calcium cyanide does not come in contact with an excess of water since the hydrocyanic acid produced would remain dissolved in the water and consequently would not be liberated as a vapor to act as a fumigant. In the case of fumigating plants there must be no water on the leaves since the calcium hydrate which is formed by the reaction would be thus consequently in contact with the leaves and injure them. It appears further that if a quantity of water intermediate between an excess as one extreme and a slight quantity such as vapor as a minimum, is present that ammonia and ammonium compounds are formed thus resulting in loss of efficiency or even a failure as a fumigant."

There are four counts in issue, which read as follows:

"1. The method of fumigating which consists in exposing dry calcium cyanide to the action of an atmosphere having sufficient humidity to decompose said cyanide and thereby liberate hydrocyanic acid gas at a rate effective to secure the desired fumigation effect.

"2. The method of fumigating an enclosed space which consists in exposing dry calcium cyanide to the action of an atmosphere in said space having sufficient humidity to decompose said cyanide and thereby liberate hydrocyanic acid gas at a rate effective to secure the desired fumigation effect.

"3. The method of fumigating which consists in dispersing calcium cyanide in pulverulent form in an atmosphere having sufficient humidity to decompose the cyanide and thereby liberate hydrocyanic acid gas at a rate effective to secure the desired fumigation effect.

"4. A method of fumigating which comprises providing a subdivided mass of cyanide and exposing the same to moist air having a relative humidity over 30% to produce poisonous gas in toxic concentrations by hydrolysis of the said cyanide."

The application of appellant was filed on June 2, 1924, which application, it appears, is a continuation in part of an earlier application filed December 12, 1922.

The application of appellee was filed on December 7, 1921.

Appellant therefore is the junior party, and the burden of proof was upon him to prove conception prior to appellee's constructive reduction to practice, or that appellee derived the invention from him. In view of the conclusion we have reached, it is not necessary to consider the question of appellant's reduction to practice.

The Examiner of Interferences reached the conclusion that the issue was one of originality, and that appellee derived the invention from appellant through the research department of the American Cyanamid Company, of which appellant was a vice president and the appellee an employee. In reaching this conclusion, the Examiner of Interferences held that appellant instigated certain studies and experiments by said research department, resulting on April 30, 1921, in the discovery embraced in the counts. He therefore accorded to appellant said date of April 30, 1921 as his date of conception, and further held that appellee derived his knowledge of the invention through appellant, or, in other words, that appellant was the original inventor of the method in dispute.

Upon appeal, the Board of Appeals reversed the decision of the Examiner of Interferences, holding that appellant had not proved conception of the invention prior to appellee's filing date, and further holding that appellee was entitled to May, 1921, for conception, and to his filing date, December 7, 1921, for constructive reduction to practice, thereby further confirming his claim to priority.

Voluminous testimony was taken by both parties, but, in view of the conclusion we have reached, only a small portion of it need be considered.

The first question for determination is whether the record establishes conception of the invention by appellant at any time prior to appellee's filing date. If it does not, it is the end of the case, and the decision of the Board of Appeals must be affirmed.

It appears that the American Cyanamid Company is the owner of appellant's application, and for several years it had been engaged in the production and marketing of calcium cyanide, used in the mining industry for the production of gold and silver from ores, and in the production of liquid hydrocyanic acid. Appellant is an engineer, and, as a vice president of his company, his duties had been principally concerned with the design, construction, and operation of the various plants of said company. One Dr. Walter S. Landis, also a vice president of said company, was also chief technologist in charge of all experimental and development work of the company.

Appellee entered the employ of said American Cyanamid Company in July, 1917, and from that time until the latter part of 1920 served as a salesman. In December, 1920, he was put in charge of a newly formed commercial development bureau established for the purpose of promoting the sales activities of the company and finding new fields for its products. He remained in the employ of the company in this capacity until February, 1922, when he was discharged. He filed his application for patent, as before stated, on December 7, 1921, without notifying any of the officers of the company that he had done so, and never did inform them of that fact. He testified, however, that before such filing there was general talk in the office of the company that he and two other employees were to be discharged.

It appears from the testimony that fault had been found by the users of the calcium cyanide produced and marketed by said American Cyanamid Company; they asserting that the product received did not have the cyanide content stated in the invoices. It was then found that when the product was exposed to the air it would lose some of its cyanogen content.

The said Dr. Landis testified concerning the invention as follows:

"Q. Do you know the circumstances under which the invention was made? A. The subject of deterioration of calcium cyanide produced by the Cyanamid Company had been discussed a number of times and referred to the technical department for help and assistance in attempting to solve it. The technical department was never able to accomplish this result to the satisfaction of everyone. I recall that at one of the meetings of the heads of departments of the Cyanamid Company, at which Mr. Cooper, Mr. Bonn was present, Cooper made the remark why in the world we didn't try to use it since we couldn't cure it. Something to that effect, and made the suggestion why we didn't try to kill something with it, and from that remark the laboratory was put to work to see whether it was effective as a killing agent, carried out some experiments, and found that it would kill rats, rodents of that type, and from that they developed the use of this cyanide as a pest killing agent.

"Q. Who was instrumental in getting the

laboratory to conduct this work? A. I was at that time in charge of the laboratory and I requested the head of the laboratory to conduct the experiments."

Later, and after a recess, Dr. Landis further testified as follows:

"Q. I will ask you to please refer to your answer to Q. 36 [first question above quoted] and state what you understood by the suggestions of Mr. Cooper, which you say were made?

"Mr. Hubbell: Objected to as immaterial and irrelevant.

"A. The question had been up before the executive officials of the Company here on going into fumigation here in the east—into going into fumigation of commercial warehouses, storehouses, households here in the east—using liquid hydrocyanic acid just as it was used in California for that same purpose. We debated and discussed the possible field and market for such an activity here in the east over a period of months, and it had happened that two pertinent inquiries came in for fumigation in the office here around about this time. It is my remembrance that one of them came in in February, but this happened so long ago I would not like to place the date too exactly—in connection with an ash dump out here in Flushing in which there was a terrible pest of rats which were running around the neighborhood out there and creating a lot of trouble. There had been a similar question raised about a similar ash dump up in the Bronx sometime previously. There was a question of fumigation raised up here—I have forgotten whether it was the American Museum of Natural History, or up in the Zoological Garden in the Bronx, that they had been having some difficulty up there with some of their specimens being attacked by some insect pests. Fumigators were at work here around the City of New York doing household fumigation, warehouse fumigation, ship fumigation—was being practiced here in New York. I think the Fruit Company was fumigating boats at that time. The Government had been fumigating boats with hydrocyanic acid for some time down at Quarantine, all of which had raised a question in our minds as to whether that should not be a productive business, to go into that liquid hydrocyanic acid, which had been developed in California.

"In connection with the ash dumps which were infested with rats, I believe a study had been made as to whether it would be advisable to fumigate those with liquid hydrocyanic acid. As I remember, the general conclu-sion of it was that it would not be a very simple matter to do, and it was along with those discussions that this remark was made by Cooper, after we had been having a lot of trouble with this decomposition over in the laboratory in connection with a process we were working on for producing sodium cyanide from this calcium cyanide, having a lot of trouble with loss in the process, and it was in the combination of discussions between our losses and this question of going into fumigation that this remark was made by Cooper as to *why we did not use that property of decomposition, setting free gas for killing some of this stuff we were talking about.*" (Italics ours.)

Appellant did not testify, nor is there in the record any explanation of his failure to do so. There is no evidence in the record that appellant had any other or further connection with the invention in issue except that, as an officer of the company, upon the request of Dr. Landis, he (Cooper) authorized an application for a patent, but the name of the proposed applicant does not appear.

Both the Examiner of Interferences and the Board of Appeals held that the testimony of Dr. Landis, above quoted, did not establish conception of the invention by appellant. The Examiner of Interferences, however, held that, as a result of appellant's suggestion as to the possible use of calcium cyanide, the invention here in issue was developed through a series of experiments in the laboratory of the American Cyanamid Company, and, as the witness Landis testified that such experiments were instigated by appellant, he (appellant) should have the benefits of them, and accordingly gave him a date of conception of April 30, 1921.

The said laboratory experiments, performed prior to April 30, 1921, were the subject of two reports which are in evidence, designated as Cooper Exhibits 1 and 2. Exhibit 1 bears the date of April 16, 1921, and Exhibit 2 is dated April 30, 1921.

Because of its importance in determining the issue here involved, we quote said Exhibit 1 in full:

"Weekly Report—Experimental Laboratory —April 16—1921.

"Technical Investigation No. 46—Sodium Cyanide.

"Aero Brand Cyanide as an Insecticide.

"It has been suggested that finely ground Aero Brand Cyanide might be used as a dry dusting powder for the control of plant pests such as the Boll-weevil. The following ex-

periments will show that Aero Brand Cyanide, on account of its instability when exposed to air, is totally unsuited to any such use.

"Aero Brand Cyanide was ground over night in the pebble mill and screened through a 200 mesh sieve. The material passing the sieve analyzed 49.4% NaCN. In the first experiment 5 g. samples of the ground cyanide were spread out on watch glasses and exposed to the atmosphere for varying lengths of time. The weather on this day was showery and the humidity high. After one hour of exposure the material analyzed 16.0% NaCN, after two hours of exposure 7.4% NaCN, and after four hours, 1.8%. These losses would undoubtedly have been very much greater if the layer of material exposed could have been made thinner. Due to the limited size of the watch glass, the thickness of the exposed material was from $\frac{1}{16}$ to $\frac{1}{32}$ of an inch.

"In another experiment a very thin layer of the finely ground material was spread out on paper and exposed to the air. The evolution of hydrocyanic acid was rapid. The course of the decomposition was followed by holding strips of moist phthalophenone paper over the material. No test for hydrocyanic acid could be obtained after one hour of exposure.

"As a final experiment 5 g. of the powder were dusted over a surface of 700 sq. cm. area. An analysis made of this material after only 30 minutes exposure showed only 1.8% NaCN remaining out of an original 49.4%, representing a loss of 96.3% of the cyanide content within thirty minutes.

"G. H. Buchanan."

With respect to Cooper Exhibit 2, which is also a laboratory report, the first part of the report describes additional experiments of the same general character as those described in Exhibit 1. Immediately following this description is the following heading and statement:

"Action of Aero Brand Cyanide Dust on Rats.

"The ease with which Aero Brand Cyanide is acted upon by moist air with production of hydrocyanic acid suggests its use for fumigation. As the following experiments will show, the finely divided material is very toxic."

Then follows a detailed description of the experiments conducted, concluding with the following statement:

"These experiments emphasize the extreme danger of Aero Brand Cyanide dust in poorly ventilated places and admit the possibilities of the use of the finely divided material for fumigation under circumstances where the use of dust would not be objectionable. The action of the dust is very much slower than the action of the gas so that there is greater opportunity for the vermin to escape if any means of exit remains open."

Turning now to a consideration of appellee's activities, it is admitted that he was very active in developing a theory that he had that calcium cyanide in the form of dust could be successfully used as an insecticide, particularly in the eradication of the cotton boll weevil. His original conception did not involve its use by fumigation but by contact of the insect with the dust when spread upon the plant.

On March 23, 1921, appellee prepared and sent to a Mr. Bonn, his superior, who was sales manager of the company, a memorandum which is in evidence as Hubbell Exhibit J. From this memorandum it appears that appellee suggested the use of calcium cyanide as a dusting insecticide, but there is no indication therein that he contemplated its use as a fumigant. The memorandum states:

"Clearly, the adaptability of Aero Brand Cyanide to boll weevil control is a matter that seems worthy of serious preliminary study."

The memorandum further states:

"Liquid HCN Possibilities:

"The study of the life history of the boll weevil might reveal the possibility of economical treatment with liquid HCN—in event a 'clean-up' could be effected with but a single dosage. Much the greater possibilities, however, seem to lie in dusting with Aero Brand Cyanide—as hereinafter indicated."

In our judgment the evidence establishes that the first test conducted in the laboratory of the company, evidenced by Cooper Exhibit 1, was initiated by appellee and not by appellant. The very language of the opening paragraph of the exhibit excludes Cooper and points to Hubbell. It reads:

"It has been suggested that finely ground Aero Brand Cyanide might be used as a dry dusting powder for the control of plant pests such as the Boll-weevil. The following experiments will show that Aero Brand Cyanide, on account of its instability when exposed to air, is totally unsuited to any such use."

How appellant can claim, or how the Examiner ever found, that this experiment was initiated by appellant, on the record before us, we cannot understand. While it is true that the witness Landis stated that the experiments covered by Cooper Exhibits 1 and 2 were the result of appellant's suggestion about the use of calcium cyanide for killing purposes, Exhibit 1 shows upon its face that it was directed only to the question of whether calcium cyanide was suitable for use as a dry dusting powder for the control of plant pests such as the boll weevil, and it was found that it was not suitable due to its instability when exposed to the air.

Furthermore, one Guy H. Buchanan, a witness for appellant, who was the company's chief research chemist and was under the direction of the witness Landis and signed said Exhibit 1, testified that he conducted the experiments therein detailed. Upon being asked upon direct examination the question, "Will you explain the general nature of the experiments reported in Cooper Exhibit 1?" he replied as follows: "An attempt was made to determine whether or not finely ground Aero Brand cyanide could be used as a stomach poison for the control of plant pests, such as the boll weevil. It was found that the material was too unstable for this purpose and it was so stated in the conclusion, that the material was unsuited to such use."

It is too clear to be open for argument that the experiments described in Cooper Exhibit 1 were initiated by appellee and not by appellant.

With regard to the experiments described in Cooper Exhibit 2, it will be observed that the first part of the exhibit describes experiments which were in continuation of the experiments described in Exhibit 1. The said Exhibit 2 then states: "The ease with which Aero Brand Cyanide is acted upon by moist air with production of hydrocyanic acid *suggests its use for fumigation*." (Italics ours.) Experiments are then described which demonstrated that rats were killed through the fumigating properties of the calcium cyanide in the form of dust, when exposed to the atmosphere.

Appellee's testimony is that, when Cooper Exhibit 1 was read to him by one Buch, who was Dr. Landis' chief assistant, he (Buch) said: " * * * and that, Hubbell, is the obituary of calcium cyanide for insecticide purposes."

To this, appellee testified, he replied: "Why, man, that is a fumigant and with it I can dust the Dingles off the map."

The Dingles, as the testimony shows, were engaged in citrus fumigation in California, associated with the American Cyanamid Company.

Appellee's testimony, above quoted, was given on October 29, 1928, in New York City. He testified that at that time he did not know where said Buch was, but that the last he had heard of him was two or three years previous when he heard that he was in London.

The said Dr. Landis gave rebuttal testimony on December 19, 1928, and on that occasion he testified that said Buch was in this country for several weeks prior to November 1, 1928, and that he was in the office of the witness on October 31, 1928, and sailed for Europe that night. Apparently, however, appellee was not aware of Buch's presence in this country in October, 1928.

It is true that the witness Buchanan stated that the rat experiments were directed by Dr. Landis, and we find no reason to doubt that such was the fact, but whether such direction was prompted by his reading Cooper Exhibit 1, or by the alleged statement of appellee to Buch, is immaterial. If it was not prompted by appellant, then appellant can receive no benefit from the rat experiments. Whether appellee is entitled to the benefit of them, or whether the invention developed therefrom should be credited to some other party, we need not inquire.

If appellant, upon the record before us, cannot be credited with any date of conception prior to appellee's filing date, then appellee could not have derived the invention from him. We think the rat experiments described in Cooper Exhibit 2 had their real origin in Cooper Exhibit 1.

We are clear that the testimony of Dr. Landis as to appellant's remark concerning the use of calcium cyanide for killing something is not sufficient to establish conception of the invention by Cooper. Said testimony is not convincing that Cooper ever mentioned a possible use for fumigation, and we cannot find that he did so. The failure of appellant to testify in this case is a significant circumstance. If he had a conception of the invention in issue in March or April of 1921 and disclosed it to Landis, appellant's testimony to that effect would have had very great weight, but apparently he preferred to rely upon the very vague and indefinite testimony of Dr. Landis as to such conception and disclosure. While, of course, his failure to testify is not controlling, it fortifies the conclusion of both the Patent Office tribunals and

our own that the testimony of Dr. Landis regarding the statement of appellant as to the use of calcium cyanide for killing purposes does not establish conception of the invention by appellant, and, as before indicated, the record convinces us that appellant had nothing to do with the experiments afterward conducted and that they were in no wise initiated by him. Consequently he can derive no benefit from them.

We have heretofore had occasion to consider what is required to constitute a conception and disclosure of an invention. In the case of Townsend v. Smith, 36 F.(2d) 292, 295, 17 C. C. P. A. 647, we said: "The rule is well settled in this jurisdiction as to what is required to constitute a conception and disclosure of an invention. It is well stated in Mergenthaler v. Scudder, 11 App. D. C. 264. A complete conception as defined in an issue of priority of invention is a matter of fact, and must be clearly established by proof. The conception of the invention consists in the complete performance of the mental part of the inventive act. All that remains to be accomplished in order to perfect the act or instrument belongs to the department of construction, not invention. It is therefore the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is thereafter to be applied in practice that constitutes an available conception within the meaning of the patent law. A priority of conception is established when the invention is made sufficiently plain to enable those skilled in the art to understand it."

Regarding the testimony even in its most favorable light, it falls far short of establishing conception by appellant of the invention, tested by the rule above stated.

Appellant, however, contends that, under the doctrine of employer and employee, which relationship he claims is established in the case at bar, the burden of proof was upon appellee to establish that he did not derive the invention from appellant or his associates, and cites in support of such contention the decision of this court in the case of Fritz v. Hawn, 37 F.(2d) 430, and also the cases of Laughlin v. Burry, 50 App. D. C. 273, 270 F. 1013, and Miller v. Kelley, 18 App. D. C. 163.

The rule is well established by the foregoing and other cases that, where an employer conceives the principle of an invention and an employee asserts that the conception was his, the burden is upon the employee, even though he be the senior party, to clear-

ly show that he did not derive the invention from his employer.

In the case of Jameson v. Ellsworth, 40 App. D. C. 164, 166, the court said: "Counsel for appellants contend that, inasmuch as the relation of employer and employee existed between appellant Yesbera and appellee, under the decisions of this court the presumption of inventorship is in favor of the employer. Before this rule may be invoked, however, it must appear that the employee was engaged in perfecting a device under the general directions of the employer. Appellee was the general manager of the company, and had acted in that capacity for a number of years. He was not employed for the purpose of perfecting this or any other invention. Hence, it must affirmatively be shown that, at least, the broad idea was disclosed to appellee by appellant Yesbera before the presumption will attach. Until this condition is presented, the burden of proof remains on appellants, the junior parties."

In the case of Lewis v. Strom, 52 App. D. C. 251, 285 F. 985, 988, the court said: "Counsel for Lewis cite cases to the effect that, where one employs another to perfect the details of an invention of which he has conceived the general principle or plan, he is entitled to the benefit of the other's work. We do not deny the principle, but it is not applicable. The proof here fails to show that Lewis, the employer, had conceived the general principle or the plan, or, if he did, that he communicated it to Strom."

We have found that appellant has not established conception of the invention here in issue at any time prior to appellee's filing date, and, if we regard, for the purpose of argument, that appellant was the employer of appellee, it is clear that appellee was not working under the direction of appellant and derived no knowledge of the invention from him.

The mere fact that appellant was an officer of the American Cyanamid Company, the real employer of appellee, is not, as correctly stated by the Board of Appeals, any evidence that he invented the subject-matter of the issue.

It would be a strange rule indeed, where an employee of a corporation files an application for a patent, and thereafter an official of the corporation files an application for a patent upon the same invention, and the evidence establishes that such officer never conceived the invention at any time, that the employee should be required to furnish any further proof in an interference proceeding

where the only issue involved is one of priority. How can one be a *prior* inventor if it be shown that he has made no invention at all prior to the filing of his adversary's application? The answer is self-evident.

Appellant makes another contention in his brief in the following language: "While the cases cited in this brief all support this viewpoint, we have not found a decision exactly in point, and we believe that this Court should make a holding that where *each of the parties* to the interference *is under obligations to assign* to a common assignee, *the choice* of the inventor *by the assignee should be conclusive* on the question of priority. Applying the rule in the present case, since the company has chosen Cooper, a decision in favor of Cooper on the question of priority should be given." (Italics quoted.)

The difficulty with the stated proposition is that appellee does not concede that he is under any obligation to assign his application to appellant's assignee. If that were conceded, this interference would not be before us. Whether appellee is under any obligation to make such assignment cannot be determined in this proceeding. We are informed by the briefs of the parties, though there is nothing in the record to that effect, that that question is now in the process of judicial determination in another forum, and will, no doubt, in due time be there decided. Certainly, on the record before us, there is nothing to warrant the application of the doctrine of election by a common assignee.

 It appears that appellee filed his application while in the employ of appellant's assignee without informing any of its officers of that fact. This might be a fact to be considered, together with appellee's explanation of that fact, if our conclusion was based upon the question of whether or not appellee was the inventor of the process in issue, or whether the invention was made by some other person or persons not parties to this interference, but it can have no bearing upon the issue of priority as between appellant and appellee, where it does not appear that appellant had any conception of the invention prior to appellee's filing date, as we have held. Appellant would not be entitled to an award of priority as against appellee even if the proof established that the invention was in fact made by other persons. Foster v. Antisdel, 14 App. D. C. 552. The issue in an interference proceeding is not whether a senior party may be entitled to priority as against all persons, but the question is whether the junior applicant has sustained the burden of establishing his own priority over that of his opponent. Beidler v. Caps & Leininger, 36 F.(2d) 122, 17 C. C. P. A. 703.

We would further observe that, if the invention was in fact made by employees other than Cooper or Hubbell, that fact would not warrant Cooper's assignee in selecting him as the inventor to receive a patent. In the case of United States Gypsum Co. v. Bestwall Mfg. Co. (D. C.) 15 F.(2d) 704, 705, the court, speaking of the patent laws, said: "* * * The statute confers no power upon an employer to declare that one of his employees is an inventor, when, in fact, the employee has made no invention. * * *"

In view of our conclusion that the record fails to show that appellant ever conceived the invention in issue prior to appellee's filing date, and appellant being the junior party, the award of priority to appellee made by the Board of Appeals must be, and is, affirmed.

Affirmed.