45 C.C.P.A. (Patents).

**Fernand Georges BAC, Appellant,**

v.

**Alfred L. LOOMIS, Appellee.**

**Andrew ALFORD, Appellant,**

v.

**Alfred L. LOOMIS, Appellee (two cases).**

**Patent Appeal Nos. 6299–6301.**

United States Court of Customs and Patent Appeals.

Jan. 31, 1958.

Rehearing Denied March 21, 1958.

Ralph B. Stewart, Washington, D. C., (Edward D. Phinney and Rayson P. Morris, New York City, of counsel), for Bac.

Rayson P. Morris, New York City (Edward D. Phinney, New York City, and Ralph B. Stewart, Washington, D. C., of counsel), for Alford.

H. L. Godfrey, Michael W. Werth, and T. Hayward Brown, Washington, D. C., for Loomis.

Before JOHNSON, Chief Judge, and O'CONNELL, WORLEY, RICH, and JACKSON (retired), Judges.

WORLEY, Judge.

These appeals were taken from the decisions of the Board of Patent Interferences of the United States Patent Office, awarding priority of the subject matter in issue in interferences Nos. 84,143 and 85,626 to the junior party, Alfred L. Loomis. Both interferences involve an application of Loomis, No. 603,090, filed July 3, 1945, and patent No. 2,419,525, issued April 29, 1947, to Andrew Alford on an application filed October 8, 1942. Since the appeals involve the same parties, the same application and patent, and the same testimony, they will be considered in a single opinion.

The single count in issue in appeal No. 6300 is as follows:

"Count 1. A beacon system for determining the location of a craft comprising means for transmitting pulses of energy from a first pair of spaced points, the pulses transmitted from one of said points having a predetermined time relation with respect to the pulses transmitted from the other of said points, means for transmitting pulses of energy from a second pair of spaced points, the pulses transmitted from one of said second pair of points having a predetermined time relation with respect to the pulses transmitted from the other of said second pair of points, means for receiving the pulses transmitted from said points, and means responsive to said receiving means for measuring the relative propagation times of said pulses from said points to said receiving means whereby the location

of said receiving means with respect to said points is determined."

The single count involved in appeal No. 6301 is as follows:

"Count 1. In a beacon system wherein course line indications are produced in a receiver by comparison of the relative timing of received pulses, a beacon for defining intersecting course lines comprising means for transmitting pulses of energy having predetermined time spacings from a plurality of first substantially fixed positions, means for transmitting pulses of energy from a plurality of second substantially fixed positions, the pulses transmitted from each second station being transmitted at predetermined time intervals after pulses transmitted from a first station and said time intervals being small in comparison to said time spacings, and means for varying said time intervals."

The appellant, Alford, did not take testimony and is accordingly restricted to his filing date, October 8, 1942, for conception and constructive reduction to practice. Appellee, Loomis, took testimony which was held by the board to establish conception as early as November 1, 1940, reduction to practice on November 15, 1942, and the continuous exercise of reasonable diligence from November 25, 1940, until the date of reduction to practice. Each of those holdings is challenged by appellant.

The subject matter at issue in each appeal is a system for determining the position of a craft by means of impulses emitted by radio transmitters, and involves the use of at least two pairs of such transmitters. The transmitters of each pair are synchronized in such a manner that they emit impulses at the same frequency, but with the impulses of one station lagging, by a predetermined interval, behind those of the other.

When the impulses of a pair of stations are received by a craft whose position is to be determined, the lag between

them will differ from the predetermined lag fixed at the stations by a degree which is a function of the difference between the distances of the craft from the respective stations. That fact will enable the navigator of the craft to fix the location of one line through his position, since the locus of points having any specified difference in distance from the two stations is a hyperbola having its foci at the stations. By obtaining readings on sets of impulses from two pairs of stations the navigator may locate his position as lying on each of two hyperbolas, and hence at their intersection; thus definitely fixing the position.

Loomis claims to have conceived in September 1940 an idea which he described in his testimony as follows:

> "With these ideas flowing together it came to me that better navigation than celestial navigation would be possible by sending out independent pulses from two or more stations, which could be synchronized by a monitor station, as we had synchronized the two crystal clocks at the laboratory, and that these signals could be picked up by an aeroplane or a vessel without disclosing their position. We also knew, of course, that cathode ray oscillographs could be built that could compare these signals to within a few microseconds.

> "I recognized that two stations only gave a line of position and not a fix, but I was used to the fact that all celestial observations only give the lines of position, and I realized that, if a line of position could be obtained from two stations, a cross could be obtained from another pair of stations at an angle to the first pair of stations, similarly to celestial observation."

Loomis testified that he disclosed his idea as above described to Professor E. L. Bowles and Frank D. Lewis at least as early as November 1, 1940, and his testimony in that respect is corroborated by Bowles and Lewis. Although the witnesses testified largely from recollec-

tion after a lapse of more than twelve years, we agree with the board that their testimony is sufficient to establish that Loomis was in possession of the idea set forth in his testimony above quoted as early as November 1, 1940.

It will be noted that Loomis referred to the synchronization of the transmitting stations by means of a "monitor station," which he described as being a third station so located that it could receive the impulses from both transmitting stations. When those impulses were not properly synchronized, the operator at the monitor station was to advise one of the transmitter operators by telephone so that appropriate correction could be made.

Bowles testified that Loomis also disclosed to him "the possibility of one station being a slave and being under the control of the other." However, since neither Lewis nor Loomis mentions any such thought, and since Bowles admitted that "I cannot remember all the details. It is many years later," we do not consider the testimony sufficient to establish that the idea of operating one station as a slave station formed a part of Loomis' idea. In that connection it may be noted that the testimony shows that the first attempts to put the Loomis idea into practice involved the use of a separate monitor station and that the slave station idea appears to have been introduced later. The record does not show who first suggested that idea.

Loomis admittedly did not disclose his idea by means of detailed charts or diagrams, but the board found his disclosure to be sufficient to establish conception of the invention in issue since "all of the elements were old per se and were contemplated to function in a manner, except as arranged and for the purpose adequately described to the witnesses by Loomis, so that it was only necessary to order the elements built by specification and to assemble them in accordance with Loomis' scheme."

Although the holding that Loomis is entitled to a conception date as early as November 1, 1940, depends upon the

accuracy of the statement just quoted, that statement is evidently merely an opinion since the board cited nothing specific in support thereof. Thus it is necessary for us to determine whether the board's conclusion is supported by the record. Before doing so, it may be noted that it seems strange that, as held by the board, a period of two years of reasonable diligence was necessary to reduce the invention to practice if nothing more was to be done than to order parts to specification and assemble them "in accordance with Loomis' scheme."

It is evident that the successful operation of the system in issue is dependent upon a very exact coordination of the impulses emitted by the transmitting stations since Loomis' witness, Fletcher G. Watson, testified that a reading of one microsecond corresponds to about 1,000 feet in fixing the position of a craft, and the witness Bowles indicated that it was necessary to fix the position within a quarter of a mile. Accordingly, an error of two or three microseconds in the transmission interval might well prevent the fixing of the position with the required degree of accuracy.

Loomis testified that two of the most accurate crystal clocks available at the time of his alleged conception of the invention would keep in synchronism "to within a few microseconds" for a period of three to five minutes, after which "a small manual adjustment" was required. Since the adjustment, as visualized by Loomis in 1940, was to be made as the result of information obtained by telephone from a monitoring station, it is clear that it would not take place instantly. Accordingly, the impulses would at best be accurate only within "a few microseconds," and might be in error still more during a period when adjustment was about to be made. It seems very doubtful, therefore, if the clocks available in 1940 could have functioned with the necessary degree of accuracy.

Loomis testified that in the fall of 1940 he was chairman of a research committee set up by Dr. Vanevar Bush

known as the Microwave Committee. He stated that at the next meeting of that committee after his alleged conception of the invention in issue, the committee recommended to Dr. Bush that contracts be made to further research on the matter and that "contracts, at that time, were let to the Bell Laboratories to develop accurate crystal clocks, because of their great experience in that field." Thereafter, Loomis followed developments "only in the same way that I followed all the other developments that were going on in the Radiation Laboratory, allowing each group to carry the ball in their particular research." He testified that he followed the work reports, but could recall only one short visit to a transmitter station. There is nothing to show that he contributed any ideas to the project after his original suggestion.

The progress of the work, as brought out by the testimony, may be summarized as follows: During the summer of 1941 a trial system was set up including transmitting stations at Montauk, Long Island, and Fenwick Island, Delaware, and a monitoring station at Manahawkin, New Jersey. The frequency used was approximately 30 megacycles. That frequency, however, was found to be unsuitable and much lower frequencies were used in subsequent experiments.

In the fall of 1941 low frequency transmitters were installed at Montauk and Fenwick, and in January 1942 experiments were made, using a plane in Bermuda which received impulses from those stations. While John Alvin Pierce, who participated in that test, stated that the results "were regarded as highly satisfactory" he admitted that any individual reading obtained might vary "perhaps as much as ten miles from the true position," which is far outside the allowable limit referred to, as above noted, by the witness Bowles. Pierce further stated that "It was in fact this experiment that led me to devise a circuit for making amplitude visually equal," and that during the six months following the experiment "entirely new transmitter timing

equipment was built, much more stable and much less complicated than the equipment that had been used at the time of the Bermuda experiment, and much higher powered transmitters were built." Also, as testified by Loomis' witness David Davidson, the monitoring station was eliminated when the high power transmitters were installed, and that function was transferred to one of the transmitting stations. It seems evident, in view of the foregoing changes, that the results of the January 1942 test were not regarded as satisfactory.

After the new equipment was installed, tests were made in June and July 1942 utilizing a dirigible and a ship, respectively. Those tests are alleged to have given satisfactory results but, since they involved only two transmitting stations, they did not embody the invention here in issue, which requires the use of at least two pairs of transmitters.

The first tests using two pairs of transmitters were made in November 1942, subsequent to the filing of Alford's application.

It will thus be seen that a period of two years of intensive research, experiment, and modification intervened between Loomis' alleged conception of the complete invention here involved, and the first actual attempt to operate an embodiment of that invention as defined in the interference counts; and that the actual embodiment differed from Loomis' suggestion in omitting the separate monitoring station and in using a low frequency which was found to be necessary but was not suggested by him.

While the testimony is not consistently definite as to which of the elements used in the November 1942 tests were available when Loomis first disclosed his idea, and which were specially designed later, it is quite clear that vital and extensive developments were necessary, after Loomis' disclosure was made, to put the idea into practice.

Thus, as above noted, Loomis testified that a contract was let to Bell Laboratories "to develop accurate crystal clocks," which clearly suggests that no sufficiently accurate clocks were then available.

Loomis' witness Tierney, who was first associated with the project in March 1941, stated that "as I understood it, we had ahead of us development and field problems," while Davidson testified that as of April or May 1941 "we were engaged to test this equipment and to try to bring the mass of equipment into a workable system."

Frank A. Polkinghorn, who was connected with the project from the beginning, testified as follows:

"Originally it was given to us as a very broad affair, and I believe it was never specified in writing by the NDRC in any detail. I am not sure, though, that the records wouldn't show that we ourselves made some more detailed specifications in the receiver group, showing what all receivers should do. For instance, when we started the job, I believe there was no pulse rate given; therefore this was equivalent to not knowing the length of measurement we were to measure. I think problems of that sort we had to work out; but then each company, I think, was free to design a receiver which would get this result."

Edward L. Bowles, the secretary of the Microwave Committee in 1940 and 1941, stated that: "We, that is the Microwave Committee, placed contracts with several companies, as I recall it, to develop component aspects of the equipment necessary to carry out full scale experimentation of this idea."

Davidson, who first worked on the project in the spring of 1941, testified as follows:

"35Q. What were generally the differences between the transmitters at the time of the Manasquan test and at the time of Pierce's Bermuda test? A. Well, they were completely different, radically different. * * *

* * * * * *

"75Q. Could you tell us generally what was the activity with regard

to Loran from May 1941, when you said that you entered this field, until January of 1942 when Pierce made his test? What was generally the activity in there? A. * * * And it was just on rough ideas or specifications laid down, * * * and being more or less thinking people and not blindly following orders to get them working, realizing we couldn't get them to work after a while, we began to reevaluate this system and say 'Really, the idea is a good idea. It should work. What does it take to make it work, and what can be [sic] do, at least as a radio system, to be of some utility to those in the war effort?' "

Davidson also stated that the following corresponded to his recollection of the situation as of the late summer of 1941: "While these medium frequency tests were under way, the first concrete information about the British Gee system was supplied to the Radiation Laboratory during the late summer of 1941 by A. G. Touch of B.A.C. The visit of Touch was timely since it came when *all the early Project III* [the project here involved] *ideas on indication had been found awkward, if not impractical.*" (Italics ours.)

John Alvin Pierce, who was working on the project in the late summer and fall of 1941, said of a report made at that time:

"A. Well, we might translate this report as saying in effect it seems possible to have a useful low frequency hyperbolic pulse navigation system, but that the kinds of equipment we used in this experiment are almost none of them satisfactory. Timers are not sufficiently stable, receivers were not sufficiently free from noise, and particularly the indicating equipment was nothing short of cumbersome and inconvenient, which was reasonably satisfactory for experimental purposes but could not be used with any degree of satisfaction for operational purposes.

* * * * * *

"A. Aside from being cumbersome the primary technical defect in this sort of thing is that the local frequencies at which these traces operate is not precisely synchronous with the repetition frequencies at which the pulses are received, so that they move around at the traces in trying to read the timing of moving impulses with regard to fixed direction and greatly limits the accuracy with which a measurement can be made.

"16Q. Wasn't it possible to stop that? A. Only momentarily, essentially. * * *

* * * * * *

"After this experiment the proposal of using super-imposed pulses, the so-called two trace indication, was made, I think independently by two people, but at least within a very short time."

It appears from the foregoing that the work done following Loomis' disclosure of his idea was not a mere building to specifications, but involved extensive and elaborate development work in which the workers were told what result was desired and left largely to their own ingenuity as to design. It further appears that notwithstanding intensive work of that character, the project was virtually bogged down in the late summer of 1941 and ultimate success was attained only after the incorporation of ideas which were not a part of Loomis' original disclosure and, apparently, were not suggested by him.

In Mergenthaler v. Scudder, 11 App. D.C. 264, conception of an invention was defined as follows:

" * * * The conception of the invention consists in the complete performance of the mental part of the inventive act. All that remains to be accomplished, in order to perfect the act or instrument, belongs to the department of construction, not invention. It is therefore the formation, in the mind of the inventor, *of a definite and permanent idea of the complete and operative*

*invention, as it is thereafter to be applied in practice, \* \* \*."* (Italics quoted.)

The foregoing definition has been repeatedly cited with approval by this court. Townsend v. Smith, 36 F.2d 292, 17 C.C.P.A., Patents, 647; Cooper v. Hubbell, 53 F.2d 1072, 19 C.C.P.A., Patents, 790; and Rowe v. Holtz, 55 F.2d 468, 19 C.C.P.A., Patents, 970.

Similarly, in Land v. Dreyer, 155 F.2d 383, 389, 33 C.C.P.A., Patents, 1108, we held that

"The party claiming conception of an invention must show that it was complete and operative and such as would enable a person skilled in the art to reduce the conception to practice *without any further research* or exercise of the inventive skill. \* \* \*" (Italics ours.)

In support of the contention that he had a complete conception in 1940, Loomis relies upon the following decisions: Levine v. Coe, 73 App.D.C. 242, 119 F.2d 185; Hildreth v. Mastoras, 257 U.S. 27, 42 S.Ct. 20, 66 L.Ed. 112; Williams v. Handschiegl, 48 F.2d 395, 18 C.C.P.A., Patents, 1176; Taggart v. Shilstone, 55 App.D.C. 154, 3 F.2d 95; and Edison v. Foote, 1871 C.D. 80. The first three of those cases are not directly in point, since they do not relate to the question of conception of an invention, but to the operativeness of the disclosure of an application or patent. Moreover, none of the cited cases involved a situation in which it was necessary to conduct research and experiment, and design new apparatus and procedures on such an extensive scale as in the instant case.

It may be that the necessity for a certain amount of selection of sizes of parts, materials, etc., along predetermined lines does not necessarily negative a complete conception of an invention, but where, as here, an elaborate program of research, experimentation and design of parts is necessary before an operative apparatus can be produced, it cannot properly be said that a complete conception of an invention within the meaning of the patent laws has been attained.

In our opinion, what Loomis thought of and disclosed in the fall of 1940 did not amount to a conception of the invention here involved, since it clearly was not a completion of the mental part of the inventive act. While it appears that Loomis' suggestions set in motion the program which eventually led to the successful practice of the invention, that result was achieved only after almost two years of vigorous research and experimentation, and was made possible by the incorporation of the ideas of other persons. We are unable to agree with the board that such a program involved nothing more than building parts to specification and assembling them in accordance with Loomis' disclosure.

There is no evidence of record as to anything contributed by Loomis after 1940 which would show a completed conception of the invention in issue by him. It does not appear that he originated any of the added ideas which made the final success of the invention possible after the unsuccessful work during the summer of 1941. Moreover, even if it could be assumed that the work and suggestions of those engaged on the Loran project inured to the benefit of Loomis, the evidence will not support a holding of complete conception prior to November 1942, when the first system using two pairs of stations was tested; and that date is subsequent to Alford's filing date.

In our opinion Loomis has failed to establish conception of the subject matter involved in these appeals prior to the filing date of the application on which Alford's patent was issued. It is unnecessary, therefore, to consider in detail the questions of diligence and reduction to practice. It may be noted, however, that the board was of the opinion that Loomis had established no reduction to practice prior to November 1942. We are of the same opinion.

For the reasons given, we find that Loomis has failed to establish conception

of the invention prior to the filing date of the application on which Alford's patent was granted. Accordingly, priority should have been awarded to Alford.

The decision of the Board of Patent Interferences is reversed.

Reversed.

### Appeal No. 6299

■ This is an appeal from the decision of the Board of Patent Interferences of the United States Patent Office awarding priority of invention of the subject matter of Interference No. 83,846 to the junior party, Alfred L. Loomis, appellee here. The interference involved application No. 421,562, filed by appellant Bac on December 4, 1941, and an application of Loomis, No. 603,090, filed on July 3, 1945. Bac has been given the benefit of an application filed in France on March 5, 1941.

The instant appeal involves a radio pulse position indicating system which is closely related to that involved in Appeals Nos. 6300 and 6301, which are the subject matter of a decision of even date herewith.

The single count in issue is as follows:

"A radio pulse position indicating system including means for radiating pulses of radio energy from a plurality of predetermined locations, means for synchronizing the radiation of said pulses so that all pulses are radiated in predetermined phase relation, remotely located receiving means including means for receiving said pulses, a timing indicator, a source of oscillations, means for adjusting the frequency of said oscillations, means connecting said source to said indicator for driving said indicator at a substantially constant rate, and means connecting said receiving means to said indicator for applying received pulses to said indicator to denote the relative times of reception of said pulses whereby the difference in the distances between said locations and said remotely located receiving means may be indicated."

The same testimonial record was presented by the party Loomis in all three cases. Bac did not take testimony or introduce evidence. The general subject matter involved is discussed in said decision in appeals Nos. 6300 and 6301, and need not be repeated here. So far as the questions presented here are concerned, the only material difference between the instant interference count and those in the other two appeals is that the former calls merely for a plurality of transmitting stations, while each of the latter requires two pairs of stations.

In our decision in the related cases referred to we have considered the evidence offered by Loomis and hold that it fails to show that the ideas conceived and disclosed by him in the fall of 1940 amounted to a complete conception of the subject matter there in issue, and for the reasons there given, we hold that such evidence also fails to establish a conception of the closely related subject matter here.

The record fails to show a complete conception or a reduction to practice by Loomis at any time between the fall of 1940 and March 5, 1941, the filing date of Bac's French application. The activity on behalf of Loomis during that period consisted merely in the organization of committees and the ordering of parts which were used in the unsuccessful attempts to set up a satisfactory system in the summer of 1941. Such activity does not show any material advance over the general idea of a result to be obtained, which was disclosed by Loomis in the fall of 1940. It follows that Loomis has established neither conception nor reduction to practice of the invention in issue prior to the French filing date to which Bac is entitled and, accordingly, priority should have been awarded to Bac.

■ It is contended by Bac that the claim is unpatentable to Loomis in view of an Indian patent issued on Bac's invention more than two years prior to the filing date of the Loomis application, and that the case should be remanded to the Patent Office for appropriate action

on that matter. It is well settled, however, that the jurisdiction of this court in patent interferences is limited to the determination of priority of invention and matters ancillary thereto. Gowen v. Hendry, 37 F.2d 426, 17 C.C.P.A., Patents, 789; Deibel v. Heise & Schumacher, 46 F.2d 570, 18 C.C.P.A., Patents, 907; and Garrett v. Cox, 233 F. 2d 343, 43 C.C.P.A., Patents, 927, and cases there cited. It is not contended that the Indian patent can be relied on in support of Bac's claim of priority here and, accordingly, it cannot properly be considered.

For the reasons above stated, the decision of the Board of Patent Interferences is reversed.

Reversed.

JACKSON, J., retired, recalled to participate.