**Gerald C. SUMMERS, Appellant,**

v.

**Charles B. VOGEL, Appellee.**

**Patent Appeal No. 7143.**

United States Court of Customs
and Patent Appeals.

June 11, 1964.

Woodcock, Phelan & Washburn, Virgil
E. Woodcock, Philadelphia, Pa., Stevens,
Davis, Miller & Mosher, Ellsworth H.
Mosher, Washington, D. C., for appel-
lant.

Herbert L. Shepard, Arthur B. Baka-
lar, Emeryville, Cal. (Beale & Jones, Ed-
ward B. Beale, Washington, D. C., of
counsel), for appellee.

Before WORLEY, Chief Judge, and
RICH, MARTIN, SMITH, and AL-
MOND, Judges.

WORLEY, Chief Judge.

Summers appeals from the decision of
the Board of Patent Interferences award-
ing priority of invention in Interference
No. 88,790 to Vogel. Summers, the jun-
ior party, is involved on the basis of his
application, Serial No. 287,853, filed May
15, 1952. Although Vogel's application
involved in the interference is Serial No.
493,999, filed March 4, 1955, he was made
senior party on the basis of his applica-
tion Serial No. 284,867, filed on April 29,
1952, of which the former is a continua-
tion-in-part.

Both parties submitted testimony, that
of Summers being in the form of a
stipulation accompanied by affidavits and
exhibits.

The board regarded the preliminary
statement of Summers as limiting the
earliest date he can establish for con-
ception, if the evidence on his behalf be
found sufficient, to April 4, 1952. It also
noted that Summers alleged no actual
reduction to practice prior to his filing
date. Observing that Vogel thus needs
only to establish conception of the inven-
tion in issue prior to April 4, 1952, in
order to prevail, the board considered
Vogel's evidence. Finding that evidence
sufficient to prove conception, the board
awarded priority to Vogel without find-
ing it necessary to consider the evidence
of Summers.

The invention in issue relates to a sys-
tem for making seismic measurements in
the logging of earth formations traversed
by a borehole. It is defined by the sole
count as follows:

"In a system for seismic measure-
ments, surface apparatus comprising
a recording unit, subsurface appara-
tus adapted to be lowered into a
borehole, means supporting said sub-
surface apparatus in said borehole,
said subsurface apparatus compris-
ing an acoustic wave source and two
receivers spaced from each other

along a vertical line, said receivers being mounted to one side of said wave source, a single electric circuit means connecting both said receivers to said recording unit, means for energizing said wave source to produce an acoustic impulse reaching said two receivers in succession, means in each receiver for translating said impulse into an electric signal to be transmitted by said circuit means to said recording unit, and switching means in said subsurface apparatus actuated upon the production of said acoustic impulse for disconnecting the receiver nearest to said wave source from said circuit means."

The general nature and purpose of the type of system involved here is explained by Summers in his brief:

"In the search for oil, considerable information as to the nature and character of the earth's formations can be obtained by measuring the velocity at which sound will travel through the formations. These velocity measurements indicate at once whether or not a subsurface formation comprises high-velocity consolidated strata, such as a limestone, or whether it may comprise low-velocity material, such as sand.

"As early as 1938, the measurement of the velocity of sound along the earth's formations surrounding a borehole was proposed. The Wyckoff patent No. 2,233,992 [1] * * * includes a full disclosure of such system which includes a cable * * for the lowering of three transducer units into the borehole. One unit is a source of sound periodically energized. The sound from this source traverses the formations adjacent the borehole and the time of travel from the source to a first detector is determined by the response from the first detector. A second detector spaced from the first detector provides additional information on the

time of travel from the transmitter to this more remote detector.

"By the simple algebraic equations of the Wyckoff patent * * *, it is shown that by subtracting the time of travel of a sound pulse from the transmitter to the near receiver from the time of travel from the transmitter to the far receiver, there is obtained the difference which represents the time required for the pulse to travel from the first receiver or detector to the second receiver or detector. This time $\Delta$ T is then independent of the path through the liquid in the borehole and represents only the time of travel along the earth's formations surrounding the borehole."

The Vogel application in interference includes a disclosure of a three transducer system of the type referred to above with the transducers arranged in longitudinally spaced relationship in an elongated tubular casing adapted to be lowered into a borehole by means of a cable attached to one end of the housing. The transducer at one end of the housing is the source of sound or transmitter with the result that the two receiving transducers or receivers are at different distances from the transmitter on one side thereof as in the prior art system discussed in the above quotation from Summer's brief. Included in the housing is electric and electronic equipment necessary for the operation of the transmitter and receivers. Connections are made from that equipment through the cable to apparatus maintained at the surface outside the borehole.

The surface apparatus includes a main power supply, a synchronizing network including all necessary synchronizing, calibrating and sweep circuits, a cathode ray oscilloscope energized from the output of the synchronizing network, a depth indicator connected to a Selsyn generator operated in coordination with the position of the housing in the borehole, and a camera electrically connected to the out-

---

1. A copy of the Wyckoff patent No. 2,233,992 is included in the printed record.

put of the synchronizing network and the depth indicator to provide photographs showing the time relationship of the signals from the receivers in response to the output signals from the transmitter. Filter circuits are provided to effect the separation of energizing power from the power supply, actuating impulses from the synchronizing network and incoming signals from the receivers.

The transmitter specifically disclosed provides the required sound signals by producing spark discharges at desired intervals. It is provided with alternating current from the power supply at the surface, which current is rectified to charge a capacitor, and includes timing and relay circuits which are actuated by energizing signals delivered thereto at proper time intervals from the surface to cause the capacitor to discharge through the spark gap.

The spark discharge produces a sound impulse of steep wave front which travels to the borehole wall and through the wall towards the two receivers, parts of the impulse energy passing to the receivers in sequence to produce electrical signals there in and those signals being transmitted through the cable to the surface for display in timed relationship on the oscilloscope.

The most significant feature by which the present system distinguishes over the prior art system appears to be the means meeting the last recitation of the count reading as follows:

" * * * and switching means in said subsurface apparatus actuated upon the production of said acoustic impulse for disconnecting the receiver nearest to said wave source from said circuit means."

That means constitutes a relay-operated switch which operates in coordination with the production of a sound impulse from the transmitter to disconnect the near receiver at a time after that receiver has been activated by the impulse but before the impulse has reached the second or far receiver. Such switch insures that the signals from the two receivers as reproduced on the oscilloscope are separately discernable in order that the interval between the impulse reaching the near receiver and the far receiver can be determined accurately. Vogel refers to the switching arrangement as a cure for cross-coupling which may occur between conductors because of the poor quality of commercially available well logging cable.

Also figuring in the present controversy is the limitation reading as follows:

" * * * a single electric circuit means connecting both said receivers to said recording unit, * * *."

With respect to that feature, the involved Vogel application states that the transmitters and receivers may be connected to the surface through the same pair of conductors by using proper filters in the cable terminal network located at the surface and described as "including all necessary filter circuits and amplifiers."

The evidence on which the board based its decision is the testimony of Vogel and two corroborating witnesses, Thomas W. Lamb and Robert A. Herolz, all employees of Shell Oil Company to which the Vogel application is assigned. Vogel himself has done experimental work on oil well logging for Shell since 1945. Lamb testified that he transferred to Vogel's group in March 1950 and worked under Vogel's direction, and Herolz testified that he worked with Vogel from about 1945 to about June 1960. Lamb had experience as an amateur radio operator and had been a Navy Radioman for about three and one-half years before joining Vogel's group. Herolz had a B. S. degree in Radio Engineering and had been an instructor for the Navy in a pre-radar training course.

The testimony demonstrates that a well logging instrument of the type in question was made under Vogel's direction by September of 1950, a date clearly established by the evidence. The instrument was taken from Texas, where it was built, to California at that time and was subsequently operated there by Herolz and Vogel. The work of constructing the

instrument was divided between Lamb and Herolz.

Herolz's testimony shows that he was primarily concerned with the construction and wiring of the recording apparatus, i. e., with the surface apparatus located in a truck and used in connection with the complete device. Lamb testified that, at Vogel's request, he installed the electronic equipment in the actual logging instrument which comprised the electronic equipment that went into the casing that was to be lowered into the borehole.

The construction is described in the testimony of Lamb and Herolz with considerable reference to drawings in the form of wiring diagrams which were introduced in evidence as Exhibits 7A, 7B and 7C. Exhibit 7A shows a circuit described as for a tool using two transmitters and two receivers while 7B and 7C show circuit connections for a tool having one transmitter and two receivers. Lamb made 7A and 7C and Herolz made 7B. The testimony is that 7A relates to structure contemplated before the device in question was made and that it was decided to leave one of the transmitters off when the device was actually constructed. According to Lamb, he made 7C immediately after completion of the wiring of the tool. Herolz testified he drew 7B before he took the instrument to California and that he drew it for his own information if something went wrong during use of the instrument.

The board concluded that "the testimony of the corroborating witnesses * * * clearly establishes the knowledge on the part of those witnesses of every element of the invention in issue as defined by the count before us and therefore establishes conception of the invention as early as, if not prior to, the referred-to trip to California by Herolz and Vogel." Discussing the evidence further, the board found that testimony of Herolz taken with statements of expenses incurred by Herolz and Vogel demonstrated the instrument was taken to California in September of 1950. On that basis it ruled Vogel had established conception of the invention in issue at least as early as September 1950 and awarded priority to Vogel as first to conceive and "first to reduce to practice (constructively)."

Summarizing his position in his brief, Summers states:

"Vogel's conception-embodiment (so referred to since undisclosed in his applications) embodies a single conductor to which he connects his transmitter and both of his receivers. This single, conductor, with ground return, is ulitized in place of the four-conductor embodiment (conductors 130 and 132) he elected to disclose for his Figure 8 * * *. This conception-embodiment requires that the single conductor (1) shall be utilized for supplying alternating current to energize the transmitter, (2) shall be utilized to supply direct current to make operative the subsurface amplifiers, and (3) shall be utilized for the transmission of signals from the receivers to various equipment located at the earth's surface.

"Summers will establish there is lacking in the Vogel proofs any disclosure of an arrangement which meets the foregoing mandatory requirements of an operative system.

"The Board of Interference Examiners did not find that Vogel had disclosed a system meeting the foregoing requirements.

"We believe reversible error occurred by the concentration of the Board on the physical structure of the downhole instrument and its concentration on the operativeness of but a part of the Vogel system, the part concerned solely with the energization of the down-hole switching relay, a finding in conjunction with the above mandatory requirements we believe represented further error on the part of the Board.

"Inasmuch as the single-conductor conception-embodiment is undisclosed by the prior art and undisclosed

by either Vogel or Summers, it is Summers' position that a fully operative conception-embodiment must be disclosed by contemporary documents, or in the alternative, by oral testimony which reasonably establishes *Vogel* had communicated to others an operative single conductor system meeting the foregoing mandatory requirements. It is not sufficient that Vogel may have initiated a chain of events resulting in construction of a system. Vogel must show that his conception was such that only *construction* remained to be accomplished."

In support of that position he discusses in particular the drawings constituting Vogel's Exhibits 7B and 7C.

■■ The issue is whether Vogel has proved conception of the subject matter of the count through the evidence which relates particularly to the instrument made under his direction by September of 1950, there being no contention that the instrument in question was not made by that date. There appears to be no significant dispute as to the applicable law, the question lying in the facts established by the evidence and in the application of the law to those facts. Briefly stated in language borrowed from Summer's brief, the law is that "conception is established when the invention is made sufficiently plain to enable those skilled in the art to understand it."

However, Summers makes the argument that Vogel's application does not disclose the embodiment of the claimed structure relied on for conception and he seems to contend that, as a result, Vogel is under a burden to establish the construction of that embodiment, i. e., the instrument made, in greater detail than would be the case if it were disclosed in the application. The main point seems to be that the feature of a single cable which is utilized to supply alternating current to energize the transmitter and direct current to operate the sub-surface amplifier and to transmit signals from the receiver to the surface equipment is undisclosed in the Vogel application.

Vogel urges, however, that his application does teach the use of a single circuit for the transmitter and both receivers and teaches the manner "in which energizing power (AC), actuating impulses (DC) and signals from the receiver may be carried over a single circuit and separated from one another." We agree with Vogel on that issue. It seems clear to us that the Vogel application contemplates a single cable construction as used in his instrument in view of the following statements made therein in connection with the description of the embodiment utilizing a single transmitter:

" * * * The transmitter T is connected to energizing power conductors 130, while the receivers R₁ and R₂ are connected to signal conductors 132. It is, however, understood that the transmitters and receivers may be connected to the surface through the same pair of conductors by using proper filters in the unit 90 [described elsewhere as 'a cable network connected to the cable 4 and including all necessary filter units and amplifiers']."

We thus find no basis for imposing a higher standard than usual on Vogel's proofs of conception for the reasons advanced by Summers.

Moreover, as indicated above, the parties do not seem to be at odds as to the legal requirements for conception. Thus, both accept as applicable here the classic definition of conception of an invention set out in Merganthaler v. Scudder, 11 App.D.C. 264, with Vogel quoting the amplification of that definition approved by this court in Townsend v. Smith, 36 F.2d 292, 17 CCPA 647, as follows:

"The conception of the invention consists in the complete performance of the mental part of the inventive act. All that remains to be accomplished in order to perfect the act or instrument belongs to the department of construction, not invention. * * * A priority of conception is established when the invention is made sufficiently plain to enable

those skilled in the art to understand it."

The board found the testimony of the corroborating witnesses Lamb and Herolz to establish the knowledge on their part of every element of the invention in issue as defined by the count. Reference to the count itself shows it does not specify the details of the "switching means in said subsurface apparatus actuated upon the production of said acoustic impulse for disconnecting the receiver nearest said wave source from said circuit means" on the "single electric circuit means connecting both said receivers to said recording unit" or the "means for energizing said wave source" to produce the acoustic impulse. We have no doubt that the testimony demonstrates that the instrument built under Vogel's direction meets every recitation in the claim. In fact, Summers does not appear to dispute that it does.

Summers, however, urges that Vogel's proofs fail to prove conception because they do not show adequate details of the circuits, particularly the control circuit utilizing the single cable or "circuit means" for supplying the alternating current and direct current to operate the subsurface equipment and for transmitting signals from the receivers.

It is inherent in the Board's decision that it found the evidence to show Vogel had such conception of the subject matter of the count that the construction of an instrument on the basis of his conception required only the exercise of the ordinary skill of the art. No basis is seen in the record for any contrary conclusion. Clearly Lamb and Herolz, working under Vogel and on his instructions, were able to put together an instrument complying with the count.

■ Summers also attacks Vogel's case with an implication that Herolz may have contributed to the conception. Thus the Summer's brief states:

"Herolz, himself, used the plural pronoun 'we' throughout his testimony which is suggestive of the fact that he was contributing original

ideas; see for example, the answers to Q 22 (R–101) [401], Q 258–267 (R–434–435), as exemplary. Vogel's testimony also gives some weight to this possibility in his statement that conception, of some portions at least, was a joint affair, more particularly see the answer to Q 57 (R–234)."

Examination of A 22 and Q 258–267 of Herolz's testimony reveals nothing that appears to us to be any indication whatever that he participated in the conception. Question 57 of Vogel's testimony is as follows:

"Q57. Do you recall what, if any, preliminary step was taken? A. Well, the first step we took was to see whether or not we could simplify the electronics in this instrument.

"The diagram on the back of the exhibit I was just referring to shows, in block diagram form, some electronics that, in detail, can be rather complicated, and we wanted to keep our down-hole instruments as simple as possible, so we conceived the idea that we would try to use conventional electromagnetic relays to do this switching operation, and the first step we took along the line of building this instrument was to get some relays and see how fast you could make one of them connect an amplifier—let me change that— how fast you could make one of these relays disconnect an amplifier from one source of signals, and connect it to another.

"We found that you could cause a relay to disconnect a signal source from an amplifier very rapidly— I am talking now about coil type relays—but it was not nearly so easy to effect contact with equal speed; so for this reason we decided we would make this first instrument in such a way that we would leave one amplifier connected, and all we needed to do then was disconnect a receiver very quickly after a certain length of time, after the transmitter had fired; so we did a simple experi-

ment of discharging condensers through the coils or relays and seeing how fast we could cause these relay contacts to open. * * *"

It does not seem to us that the latter question offers any significant support for the implication that Vogel was less than the sole conceiver of the issue of the interference.

Bac v. Loomis, 252 F.2d 571, 45 CCPA 807, referred to by Summers as a case where the recitation by a party of a program "quite similar" to that set in motion by Vogel here was found inadequate to show conception, is readily distinguished from the present case. There the court found it significant that "a period of two years of intensive research, experiment, and modification intervened between Loomis' alleged conception of the complete invention * * involved, and the first actual attempt to operate an embodiment of that invention as defined in the interference counts." Here, the instrument was made and tested within a few months of the time Vogel started his program in March of 1950 by having Lamb determine how fast a relay could be made to open. Moreover, the date the board awarded Vogel for conception is the date the construction of the instrument was completed by those working under Vogel.

Barba v. Brizzolara, 104 F.2d 198, 26 CCPA 1281, seems clearly in point here. In that case, the invention in issue included a railway car air conditioning unit located above the normal head room of the car and the counts did not specify particular means for mounting. The court ruled that conception did not require a showing of a particular mounting means since a means to carry out the conception could be worked out by one skilled in the art. We are convinced from the present record that Vogel's conception as understood by the corroborating witnesses was adequate to enable one of ordinary skill in the art to construct an instrument meeting the count.

Summers further urges error in the statement by the board that Lamb, in testifying with respect to Exhibit 70, designated "element 1 as the line which they fed the signals up, and the AC power and DC power down in response to and for energization *of the various elements in the down hole casing.*" (Emphasis added.) He states that the board "apparently did not comprehend that neither the AC power nor the DC power is fed any place *in response to anything in the exploration* tool located in the downhole casing." Taking the decision as a whole, however, we are satisfied the board did not fail to comprehend the phrase of the operation to which Summers refers or otherwise misunderstand the operation of the instrument.

The decision is affirmed.

Affirmed